39 Cal.App.4th 984 (1995)
46 Cal. Rptr.2d 491
In re JOSHUA J., a Person Coming Under the Juvenile Court Law.
SAN DIEGO COUNTY DEPARTMENT OF SOCIAL SERVICES, Plaintiff and Respondent,
v.
JAMES J. et al., Objectors and Appellants.
Docket No. D022589.
Court of Appeals of California, Fourth District, Division One.
September 29, 1995.
*986 COUNSEL
Steven A. Schutte and Alice C. Shotton, under appointments by the Court of Appeal, for Objectors and Appellants.
Lloyd M. Harmon, County Counsel, Susan Strom, Chief Deputy County Counsel, and Kathryn E. Krug, Deputy County Counsel for Plaintiff and Respondent.
[Opinion certified for partial publication.[*]]
OPINION
HALLER, J.
James J. and Delores D. appeal a judgment under Welfare and Institutions Code[1] section 300, subdivision (j), declaring their son, Joshua J., a dependent of the San Diego County Juvenile Court and removing him from their custody.
James contends the trial court erred by (1) not allowing him to relitigate the basis of a prior dependency proceeding regarding Joshua's half-sibling, and (2) admitting into evidence a psychological evaluation of James performed in connection with the prior dependency proceeding. James also contends there was insufficient evidence that reasonable efforts were made to eliminate the need to remove Joshua from the home.
Delores, who had no involvement with the prior dependency proceeding, contends (1) there was insufficient evidence that Joshua was a dependent child, (2) there were no justifiable grounds for removing Joshua from her care, and (3) the department of social services (DSS) failed to make reasonable efforts to keep or reunify Joshua with her.

PROCEDURAL AND FACTUAL BACKGROUND
James and Delores had a live-in relationship for about one and one-half years, when Delores gave birth to Joshua on December 26, 1993. Joshua was hospitalized for 10 days for a possible infection and then released to his parents. Five days later, on January 11, 1994, DSS removed Joshua from his parents' home and placed him in Hillcrest Receiving Home. Joshua was in good health when he was removed from the home.
*987 On January 12, 1994, DSS filed a dependency petition alleging Joshua was in need of juvenile court protection under section 300, subdivision (j), because his half brother, Justin, had been physically and sexually abused by James in 1987. Justin had sustained injuries to his face, ears and scalp; in addition, he suffered bite marks to the scrotum, excoriation of the tip of the penis and superficial abrasions to the anal folds. In light of the abuse suffered by Justin, DSS alleged Joshua was at substantial risk of being abused.[2]
At the January 13, 1994 detention hearing in juvenile court, James and Delores denied the allegations of the petition, and each was appointed counsel. A DSS screening summary prepared for the detention hearing contained, among other things, the following information: allegations that James's other children  Justin's full siblings  had sustained physical injuries, including fractures in the 1980s; James was not allowed to see these children; a 1989 psychological evaluation of James, which opined that small children should not be left in his care;[3] a reference to a 1987 psychiatric evaluation that reached a similar conclusion; and a report that during a *988 January 5, 1994, interview with a DSS social worker, James told her: "I want to kill you." The screening summary also reported that Delores did not believe James injured his other children.
The court found a prima facie showing had been made that section 300, subdivision (j), was applicable to Joshua and the initial removal was necessary. The court also found detention of Joshua was necessary because of a substantial danger to his physical health and there was no reasonable means to protect him without removing him from his parent's physical custody at this time. Further, the court found the lack of preplacement services was reasonable because Joshua could not have safely remained at home, even had services been provided. The court ordered Joshua's detention to continue at Hillcrest, pending placement in a confidential licensed foster home, and gave DSS discretion to place Joshua with Delores if (1) DSS determined she could adequately protect Joshua from James, (2) James was not residing on the premises, and (3) counsel for Joshua concurred. The court also ordered DSS to arrange supervised visitation between Joshua, Delores and James and gave DSS discretion to allow unsupervised visits between Joshua and Delores if Joshua's counsel concurred. The court also ordered reunification services be provided as soon as possible, specifying the following services: case management, counseling, crisis intervention, emergency shelter care, parent training and transportation assistance.
In February 1994, DSS prepared reunification plans for Delores and James. Delores's plan called for her to enroll in and complete a parenting class, maintain a separate residence from James, undergo a psychological evaluation, begin therapy, and attend battered women's services program. James's plan called for him to begin drug testing, undergo a psychological evaluation, begin therapy, enroll in and complete a parenting class, and complete parents united and battered women's services programs.
Over the next eight months, the jurisdictional hearing was put off repeatedly as the court dealt with various requests by James and Delores to have *989 new counsel appointed, joint representation, in propria persona status for Delores and finally separate counsel again.
At one point, the court ordered Delores to undergo a psychological evaluation for the sole purpose of determining whether she was capable of waiving her right to separate counsel from James. When the social worker attempted to arrange the evaluation, James did not cooperate. James also was uncooperative about signing the medical authorization form for Joshua. When the social worker asked Delores for her social security number to facilitate the above mentioned psychological evaluation, Delores said she did not have the number with her. Later, James told the social worker, Delores did not have a social security number and his social security number "will have to do."
On March 30, 1994, the court ruled that it would be in the best interests of Joshua and Delores that Delores have her own attorney rather than be jointly represented by James's attorney. Also on March 30, the court ruled that James could not relitigate the circumstances surrounding the jurisdictional findings of the 1987 dependency proceedings. The court continued the case to allow James's counsel to petition this court for a writ of mandate on these rulings.[4] The court also ordered James not to make any threats to social workers involved in the case.
On April 27, 1994, Delores requested additional visitation beyond the three supervised visits, totaling four hours a week, that DSS was providing. James joined the request, noting, among other things, Delores did not need supervised visitation since she had no involvement with the prior dependency. DSS objected, stating logistical problems made it too difficult to increase visitation. The court denied the request, ordering visitation to remain as previously ordered.
On August 12, 1994, James requested additional visitation for Delores. DSS admitted some visits had been canceled because of inadequate staffing. The court ordered DSS to make up all visits that it had canceled, but did not grant additional visitation.
On September 23, 1994, James and Delores met with Thomas Keller, Ph.D., for psychological evaluations. However, when Keller indicated he wished to interview Delores first while James took a written test, James became agitated and objected, stating he should be interviewed first. Keller told DSS he would interview Delores alone but would not see James.
During a visit with Joshua on October 20, 1994, James and Delores noticed Joshua's hands had blisters and his teeth were chipped. DSS had the *990 foster mother take Joshua to a doctor, who said the hand blisters were of an accidental nature and the teeth were discolored because Joshua was put to bed with a bottle of formula. On October 21, 1994, James left a voice mail message for Marsha Hurda, the social worker, stating he was concerned that Joshua was being abused by the foster parents and DSS was covering it up. The social worker thought the message constituted a veiled threat toward herself and the court.[5]
On October 29, 1994, James's therapist reported James had been in therapy since July 11, 1994 and had attended six sessions with him. The therapist said Joshua's safety could not be assured unless the father completed a highly structured reunification plan.
On November 3 and 4, 1994, the court conducted the jurisdictional hearing. The court received into evidence the screening summary prepared for the January 13, 1994, hearing, the social study prepared for the February 23, 1994, hearing, and additional information reports prepared by DSS for hearings on February 2, 1994, and September 26, 1994. The court overruled James's objection to receiving the 1989 psychological evaluation of him. (See fn. 3, ante.) The court also took judicial notice of the dependency files of Joshua's half-siblings. (See fn. 2, ante.)
Social worker Hurda testified she had reviewed the prior history concerning Joshua's half-siblings and conducted her own risk assessment. From her review of records, Hurda concluded James had not completed his reunification plan in the prior dependency proceedings despite his insistence that he *991 had. Hurda also testified that James's behavior over the nine months  including the voice mail message he left (see fn. 5, ante) and his interaction with the social worker on January 5, 1994  was consistent with his prior diagnosis of "antisocial behavior." Hurda also testified that the report of James's current therapist, if anything, confirmed the prior diagnosis as well.
With respect to Delores, Hurda testified she had done a risk analysis and concluded Joshua would be at risk if placed with his mother while she had an ongoing relationship with James. Hurda did not believe Delores would be able to protect Joshua from James because Delores is a very dependent and very passive person who did not believe James had done anything wrong concerning his other children. Hurda was concerned Delores would not be willing to stand up to James or accept the fact that he had injured Joshua if that should occur. Hurda conceded she never directly asked Delores if she would protect Joshua from James. Also, Hurda testified she had not attempted to set up an individual appointment with Delores to speak with her alone. Delores did not present any evidence.
James testified he had taken a spousal abuse class and attended therapy as part of his previous reunification plan. James denied beating Sally, but admitted having "roughed her up about three times, but not beating." James also denied he had intentionally abused Justin.
James testified that it was hard for him to accept the death of Justin, who died in Sally's care. James became homeless and destitute, eventually leaving the state to live with his mother. James testified his visitation rights were terminated while he was away.
As to the present dependency proceeding, James testified he and Delores had prepared for Joshua's birth by obtaining prenatal care and purchasing the necessities for a newborn. James and Delores were best friends who spent all of their time together. James would never hurt Joshua and he knew Delores would protect Joshua.
James denied threatening to kill the social worker who visited the home on January 5, 1994. When he muttered under his breath, "I'll kill him," it was a reference to his father who James thought had contacted DSS because of an ongoing feud James had with him. As to the voice mail message, James was very upset because it seemed his concerns over Joshua's well-being were being ignored; however, he did not mean to physically threaten the social worker but rather meant he would "come after" her to the full extent of the law.
On November 8, 1994, the court, after hearing argument by counsel, sustained the section 300, subdivision (j), petition. The court ordered psychological evaluations for James and Delores and scheduled a contested dispositional hearing for December 15, 1994.
*992 At the December 15 dispositional hearing, James and Delores were represented by counsel but did not appear. Counsel for James and Delores moved for a continuance because the psychological evaluations had not been prepared. DSS opposed the continuance, arguing that parents had not followed through in obtaining the psychological evaluations. The court found no good cause for a continuance and proceeded with the dispositional hearing. The court found Joshua a dependent child, and ordered him removed from both parent's custody. The court found by clear and convincing evidence that there would be a substantial risk of danger to Joshua in the parent's care and Joshua could not be protected without such removal. The court found the reunification plans to be reasonable and ordered James and Delores to comply with them.

DISCUSSION

James's Appeal

I. Relitigating Prior Dependency Proceeding

(1a) James contends the juvenile court violated his right to due process by denying him the right to relitigate the basis of the prior dependency proceeding. The contention is without merit.
Here, we are concerned with a sibling abuse petition under section 300, subdivision (j), which has two elements.[6] That is, the petition was filed on behalf of Joshua because his half-sibling Justin had been abused and there was a substantial risk that Joshua would also be abused.
The first prong of the section 300, subdivision (j), petition  that Justin had been abused  already had been adjudicated in the earlier dependency proceeding in which the juvenile court made a true finding that Justin had been injured "as the result of unreasonable or neglectful acts or omissions by the parents who had custody" of Justin, including James. Since there was a prior judgment of dependency conclusively determining Justin had been abused, James's attempts to relitigate the issue in Joshua's dependency proceeding under section 300, subdivision (j), were properly rejected by the juvenile court under principles of res judicata.
(2) "The doctrine of res judicata gives certain conclusive effect to a former judgment in subsequent litigation involving the same controversy. It seeks to curtail multiple litigation causing vexation and expense to the parties and wasted effort and expense in judicial administration." (7 Witkin, *993 Cal. Procedure (3d ed. 1985) Judgment, § 188, p. 621, italics in original.) Here, we are concerned with the collateral estoppel aspect of res judicata. Under collateral estoppel, the litigation and determination of an issue by final judgment is conclusive upon the parties or their privies in a subsequent suit on a different cause of action. (Traub v. Board of Retirement (1983) 34 Cal.3d 793, 798 [195 Cal. Rptr. 681, 670 P.2d 335].)
A party is collaterally estopped from relitigating an issue previously adjudicated if: (1) the issue necessarily decided in the previous suit is identical to the issue sought to be relitigated; (2) there was a final judgment on the merits of the previous suit; and (3) the party against whom the estoppel is asserted was a party, or in privity with a party, to the previous suit. (Producers Dairy Delivery Co. v. Sentry Ins. Co. (1986) 41 Cal.3d 903, 910 [226 Cal. Rptr. 558, 718 P.2d 920].) (1b) These requirements for collateral estoppel were met here. It is readily apparent that the second and third elements for collateral estoppel  final judgment on the merits in the first proceeding (Justin's dependency proceeding) and identity or privity of parties (James a party in both proceedings)  were present. James contends the issues to be decided in the two proceedings are different. James is wrong. The issue of whether Justin was abused was necessarily decided in the previous dependency proceeding and is identical to the first prong or issue to be determined under the section 300, subdivision (j), petition. (See Lockwood v. Superior Court (1984) 160 Cal. App.3d 667 [206 Cal. Rptr. 785].)[7]
James's reliance on In re Benjamin D. (1991) 227 Cal. App.3d 1464 [278 Cal. Rptr. 468] is misplaced. In that case, the Court of Appeal held a juvenile court adjudicating a dependency petition was not estopped from considering evidence adduced in the parents' divorce proceeding. (Id. at p. 1469.) The Court of Appeal noted the case did not involve principles of collateral estoppel because there was not privity of parties and the issues were not identical because of the divergent purposes of the two proceedings. (Id. at p. 1470, fn. 4.)
James's suggestion that the juvenile court's prior true finding in Justin's dependency proceeding had limited relevance is insupportable. The true *994 finding was a conclusive adjudication on the merits that Justin was abused, which was one of two issues presented by the section 300, subdivision (j) petition.
James argues the court's refusal to allow him to relitigate the underlying basis for the true finding in the previous dependency proceeding contravened the following statutory language of section 300, subdivision (j): "The court shall consider the circumstances surrounding the abuse or neglect of the sibling, the age and gender of each child, the nature of the abuse or neglect of the sibling, the mental condition of the parent or guardian, and any other factors the court considers probative in determining whether there is a substantial risk to the minor." We are not persuaded.
First, we note this particular statutory language is directed at the second prong or element of section 300, subdivision (j), namely, whether there is a substantial risk that the minor (in this case Joshua) will be abused or neglected; it does not involve the first prong or element that the sibling (Justin) was abused or neglected. It is the fact that Justin had been abused that James was estopped from relitigating.
Second, the section 300 petition in the prior dependency proceeding specified in some detail the nature of the abuse or neglect. The petition stated in pertinent part: "[O]n or about 5/10/87 [Justin] suffered and was discovered to have a detrimental and/or traumatic condition/injury consisting of, but not limited to, non-accidental trauma to the genital area including apparent bite marks to the scrotu[m], excoriation of the tip of the penis; superficial abras[]ions in the area of the anal folds, fingertip[] bruises to the face, bruise to the earlobe and scratch marks on the scalp. Such condition/injury would not ordinarily occur except as the result of unreasonable or neglectful acts or omissions...." The court below took judicial notice of the 1987 petition and therefore properly had before it evidence of "the nature of the abuse or neglect" suffered by Justin.
Third, we note there is every indication in this record that James wanted to relitigate whether or not Justin had been abused, not "the circumstances surrounding the abuse ... of the sibling," as provided for in section 300, subdivision (j). In other words, there was no offer of proof that James proposed introducing evidence Justin had been abused under a certain scenario (e.g., as a result of drugs, etc.) and that scenario no longer existed. Rather, the record suggests that James wanted to dispute the finding he had abused Justin by presenting such evidence as doctors had incorrectly mistaken scars Justin had from surgery as bite marks and other injuries. This would be tantamount to relitigating the finding of the abuse, which was properly blocked under principles of res judicata.
Finally, on this record we are convinced any error in not considering "the circumstances surrounding the abuse ... of the sibling" that was occasioned by the juvenile court's ruling that James could not relitigate the *995 underlying basis of the true finding in Justin's 1987 dependency proceeding was harmless. Given the serious nature of Justin's injuries, James's mental condition as reflected in the psychological evaluation, and reports of recent threats made by James, we are satisfied James could not have presented evidence concerning the "circumstances surrounding" Justin's abuse that would have convinced the juvenile court that there was not a substantial risk of abuse for Joshua. Simply put, there was an abundance of evidence to establish juvenile court jurisdiction under section 300, subdivision (j), including the requisite risk of abuse. It is not reasonably probable a different result would have been reached had James been allowed to present evidence on the surrounding circumstances of Justin's abuse. (People v. Watson (1956) 46 Cal.2d 818, 835-836 [299 P.2d 243].)

II., III.[*]
.... .... .... .... .... .... .... .

Delores's Appeal[*]

I., II.
.... .... .... .... .... .... .... .

DISPOSITION
The judgment is affirmed.
Huffman, Acting P.J., and McDonald, J., concurred.
Appellants' petition for review by the Supreme Court was denied January 3, 1996.
NOTES
[*] The opinion is certified for publication with the exception of parts II and III of "James's Appeal" and parts I and II of "Delores's Appeal."
[1] All statutory references are to the Welfare and Institutions Code unless otherwise specified.
[2] Pursuant to James's request, this court, by order of March 7, 1995, has taken judicial notice of the findings and orders made in five related dependency cases: petition No. 146-596; petition No. 146-597; petition No. 146-598; petition No. 146-599; and petition No. 146-600. These five cases involve the children of James and Sally S. who had an eight-year relationship that ended in 1987.

In May 1987, DSS filed a petition to have the children declared dependent children of the juvenile court after James physically and sexually abused the youngest child, Justin, then six months old. On June 24, 1987, James admitted the allegations of the petition. In November 1987, the children were detained in the home of Sally. In May 1988, Justin was killed by Sally's new boyfriend. The remaining four children were removed from Sally's home, and dependency proceedings were reinstated pursuant to section 387. After receiving a psychological evaluation of James and reports that James's behavior during visitation with the children was inappropriate, the juvenile court on July 2, 1990, ordered no contact between James and these four children.
On August 20, 1991, the court ordered the children returned to Sally's home. On August 19, 1992, the court released the children from dependency status. Judgment was filed giving sole legal and physical custody to Sally and continuing the no-contact order for James.
[3] The 1989 psychological evaluation contained the following clinical impression and recommendation:

"Mr. [J.'s] psychological functioning reflects a paranoid disorder marked by persecutory delusions with behavior and emotions consistent with this diagnosis. Dependent upon his perceived assessment of environmental stress and his ability to cope, he may function with varying levels of pathology appearing to be highly suspicious and hypersensitive at one extreme to presenting with prominent persecutory delusions typical of paranoia at the other extreme. His inappropriately intense interest in his children, lack of true empathic feelings, hostility, and anti-social feeling, anger towards social services, maladaptive social history, and his lack of psychological insight regarding his behaviors pose grave reservations regarding his ability to function as a parent to his children. His rigid defensive posture, characterized by rationalization, denial, and projection further exacerbate this clinical picture. The prognosis for change in Mr. [J.'s] personality is extremely guarded. It is highly unlikely that Mr. [J.] would avail himself of any mental health services as he assumes no responsibility for his maladaptive behaviors.
"Mr. [J.'s] poor social judgment, history of drug abuse, family dysfunction, test data and personality testing indicate[] he is an impulsive individual with a marked lack of insight. It is this examiner's opinion that even with intensive individual treatment and attendance at Parent's United and parenting classes Mr. [J.] may never be a suitable custodial parent for his children.
"It is strongly recommended that Mr. [J.'s] visitation with his children be terminated. Mr. [J.'s] social history and psychological presentation are such that any plan for reunification with his children may put them into serious risk for physical or sexual abuse.
"The court should provide reasonable safeguards to ensure that the children are protected from contact with Mr. [J.]."
[4] We denied the petition without comment on April 15, 1994.
[5] An unedited transcript of the voice mail message reads as follows: "Hi Hurda, this is Mitch. You know, what Delores came home with today was a crock of shit. You can take this tape right to the God Damn Grand Jury. Maam those are burn marks on my son's hands. There's ... chip marks on his two front upper teeth. Maam, I've never threatened you in my whole life, but I'll tell you what, one God damn things happens to my son, I will come after you, full-blooded, full-steamed. And you can tell Mr. Castro that and you can tell Mr. Hoffman that. If my son has one more injury on him, I'll be in court and I'll ask the judge to come after you. Those were blisters, nothing else then that. They were burn marks. They were the same, I can't even tell you what it was, but I know they were burn marks. Maam, you get Delores and me and you get off your case records and all the lie shit t's in it. Bite marks. They're surgical marks. Why don't you come back to reality and take this tape and you give it to Mr. Castro and Mr. Hoffman. I'm upset. Maam, if this is the way you take care of children you better go and, you better go somewhere where there's no children. Go away from us. Mr. Castro, Mr. Hoffman, I'm very concerned, we both are. We seeing a cover up happen again and this is ridiculous. I'm serious sir. Mr. Hoffman, if you have half the brain and heart ... that women didn't marry you because you were stupid. I'm recording this on Hurda Marsha's tape. We want our baby home immediately. We're better equipped, better functioned. We both know what abuse is. That baby was abused. Two teeth chips, one family. Hurda, if you're such a brave girl why don't ya give this tape over to Mr. Hoffman or Mr. Castro. You guys are burning our lives. We don't know what to do. We don't even know what you want. But we know what we saw yesterday. Those were burn marks. We've seen other marks on the baby ... they're just red marks, diaper rashes. Thank you Hurda."
[6] Section 300, subdivision (j), allows the juvenile court to assert jurisdiction over a minor and declare that person a dependent child of the court where "[t]he minor's sibling has been abused or neglected, ... and there is substantial risk that the minor will be abused or neglected...."
[7] In Lockwood v. Superior Court, supra, 160 Cal. App.3d 667, the same act of alleged child abuse gave rise to a dependency action under section 300, subdivision (d), and a criminal prosecution under Penal Code section 273, subdivision (a)(1). At the hearing on the dependency petition, conflicting evidence on the cause of the child's injuries was resolved in favor of the child's parents, and the petition was dismissed. The trial court denied the parent's subsequent motion to dismiss the criminal case on collateral estoppel grounds. The Court of Appeal issued a peremptory writ of prohibition directing the superior court to dismiss the criminal case. (160 Cal. App.3d at p. 673.) The Court of Appeal reasoned as follows: the dependency petition specifically alleged cruelty, and the narrow issue litigated in the dependency proceeding was whether the parents had cruelly inflicted the child's injuries. The only issue in the criminal proceeding was whether defendants willfully injured the child. For purposes of collateral estoppel, the parents had sufficiently demonstrated the identity of the issues involved in the two proceedings. (Id. at p. 672.)
[*] See footnote, ante, page 984.