Filed 7/2/14  In re K.S. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re K.S., a Person Coming Under the Juvenile Court Law. | |
| | E059401 |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, <br> Plaintiff and Respondent, <br> v. <br> D.E. et. al., <br> Defendants and Appellants. | (Super.Ct.No. J246643) |
| ———————————————————— | |
| In re Z.S., a Person Coming Under the Juvenile Court Law. | E059947 |
| ———————————————————— | (Super.Ct.No. J250415) |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, <br> Plaintiff and Respondent, <br> v. <br> K.S., <br> Defendant and Appellant. | OPINION |

APPEAL from the Superior Court of San Bernardino County.  Cheryl C. Kersey,

Judge.  Affirmed.

1

The Law Offices of Johnson & Johnson and Carin L. Johnson for Defendant and Appellant father, K.S.

Diana W. Prince, under appointment by the Court of Appeal, for Defendant and Appellant mother, D.E.

Jean-Rene Basle, County Counsel, and Jeffrey L. Bryson, Deputy County Counsel, for Plaintiff and Respondent.

In two separate appeals, which this court has consolidated, K.S. (father) appeals the juvenile court's orders terminating parental rights pursuant to Welfare and Institutions Code[1] section 366.26 over K.S., born June 2012 (*In re K.S.*, case No. E059401 (E059401)), and denying family reunification services for Z.S., born May 2013 (*In re Z.S.*, case No. E059947 (hereafter, E059947)). In his appeal of the termination of parental rights, father contends he received ineffective assistance of counsel (IAC) from his retained attorney at a prior hearing for K.S. In his appeal regarding the denial of family reunification services for Z.S., father contends there were insufficient findings to support the bypass of services. To the extent applicable to her, D.E. (mother) joins in all of father's arguments. We ordered the three matters currently pending (E059401, E059947, and E060130) to be considered together, and we stayed adoption proceedings

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

regarding K.S. pending further order.[2]  We now affirm the orders of the trial court, lift the

stay, and address the writ by separate order.

## I.  PROCEDURAL BACKGROUND AND FACTS[3]

**A.  Summary Taken From E058045 and E059401 (Involving K.S.)**

On November 2, 2012, the San Bernardino County Children and Family Services

(CFS) filed a section 300 petition on behalf of K.S., who was four months old at the time.

The petition alleged that the child came within the provisions of section 300, subdivisions

(a) (serious physical harm), (b) (failure to protect), and (e) (serious physical abuse)

because, while in the care, custody, and control of mother and father (the parents), the

child sustained a spiral fracture to his arm, inflicted by nonaccidental means.  The

petition also alleged that father failed to protect the child, in that he failed to consistently

provide a safe environment for him and failed to seek immediate medical attention for

him.  (*K.S. v. Superior Court* (June 11, 2013, E058045) [nonpub.opn.] (hereafter,

E058045), pp. 2-3.)

The social worker filed a detention report and stated that on October 31, 2012,

while the child was being examined at his regularly scheduled doctor's appointment, the

---

[2]  On December 12, 2013, we consolidated E059401 with E059947 for purposes of briefing, oral argument and decision.  We designated E059401 as the master file.  That same day, we ordered that the petition for writ of habeas corpus filed in E060130 be considered with the appeal in E059401, and that further proceedings with respect to adoption of K.S. be stayed pending resolution of the appeal.  The petition for writ of habeas corpus will be addressed by separate order.

[3]  On August 30, 2013, we incorporated the record in E058045 with the record in E059401.  To the extent possible, this section is taken from the facts our opinion in E058045.

doctor found a spiral fracture to the child's right arm. The doctor reported to a social worker that the injury was inflicted on the child and was consistent with child abuse. The parents could not explain how the child was injured. Father stated that it may have been caused by the child trying to crawl; however, when asked whether the child was able to crawl or walk, since he was only four months old, father said no. Father also reported that mother's sister said she saw the child fall on his arm and twist his arm behind his back. When questioned further for an explanation of the child's injury, father said that sometimes mother would grab the child and put him in bed with them. Father reported that the child had been staying with the maternal grandmother the past several days, while he and mother were away. However, they returned on October 30, 2012, and the child had been in their care since 4:00 p.m. that day. Father suggested that the injury could have accidentally occurred at the maternal grandmother's house.

Mother adamantly denied knowing how the child had suffered the spiral fracture. She said that when she picked the child up from her mother's home on October 30, 2012, he seemed cranky, but she did not notice anything wrong with his arm. When questioned further, mother stated that her sister said the child was lying in his playpen with his arm twisted, moving around a lot. Mother also stated that perhaps the child's arm was injured when he was pulled out of his car seat. Mother denied any domestic violence in the home, that she or father abused the child, or that her family could have injured the child. She believed the injury could have resulted from the child rolling around.

The child was transported to Loma Linda University Medical Center (Loma Linda) to be seen by a forensic medical examiner. Dr. Andrea Thorp reported that the

4

injury was consistent with child abuse and that the child would be admitted to the hospital for a complete examination to check for other injuries.

The court held a detention hearing on November 5, 2012, at which time it removed the child from the parents and detained him in foster care.

The social worker filed a jurisdiction report on November 20, 2012, and recommended that the court sustain the petition and order reunification services for the parents. The social worker reported that the child had sustained three nonaccidental injuries over a period of approximately two to four weeks. The child had the spiral fracture of his right arm, and indications of two older fractures to his ankle and one of his ribs. Dr. Amy Young opined that the rib fracture appeared to be about two weeks older than the arm fracture, but she was not able to determine a time frame for the ankle fracture. The ankle fracture and rib fracture were never treated. The social worker reported there was no indication the maternal grandmother harmed the child, since she had no history of child abuse, substance abuse, or domestic violence.

The social worker concluded that because the child's arm discomfort did not appear until after he returned to the parents' care, the spiral fracture occurred while in their care and custody. However, both parents gave inconsistent and conflicting explanations of how the child could have sustained his injuries. Father eventually admitted that the child may have slipped out of his hands when he was playing Superman and had to grab the child to prevent him from falling on the floor. The social worker spoke with several people who had concerns that father had been abusive or controlling with mother. The parents admitted they argued but denied any domestic abuse. The

social worker recommended services, since the parents had never received any previous services and the matter was still being investigated by the police.

A jurisdiction/disposition hearing was held on November 26, 2012, and the matter was set contested and continued.

In an addendum report filed on December 31, 2012, the social worker changed her recommendation to "no reunification services" for the parents, based on the police concluding their investigation and finding sufficient evidence to charge father with child endangerment. Several witnesses stated they had seen him being abusive with his former girlfriend. Other witnesses said they had seen him become so angry with mother that he punched holes in the walls, with the child present. Father was also observed "rough-housing" with the child, even when the child was just a few weeks old. Father's ex-girlfriend told the police that she feared him being alone with their children because he had extreme anger issues. Father was arrested and arraigned, and he posted bail in December 2012.[4]

The social worker reported that Dr. Young did a follow-up examination with the child on December 14, 2012, and she stated that the healing fractures of the ribs were

_____

[4] On March 19, 2014, father requested that we take judicial notice of a "copy of the minute order/plea agreement/sentencing sheet" in his criminal case. According to the plea agreement, on October 25, 2013, father entered a plea bargain agreement wherein he pled nolo contendere to negligent infliction of injury to a child pursuant to Penal Code section 273a, subdivision (a). He was sentenced to probation with credit for time served and ordered to complete a 52-week child abuse prevention program. Because our resolution of the issues raised on appeal is not dependent on the resolution of the criminal charges filed against father, we decline the request.

consistent with "front to back squeezing of the ribcage/chest" of the child and were consistent with a finding of child abuse.[5] Dr. Young further stated the rib fractures occurred close to the time of the arm fracture. Dr. Young also noted that the arm fracture was spiral in description, which implied a "twisting mechanism of injury." She opined that the fracture was an inflicted injury that was consistent with child abuse.

A copy of the police report was provided to the parties and the court. The police interviewed father, who said he did not think his son had been abused. Rather, he believed the injury was a "one time accident." He suggested that the child possibly had brittle bones; however, Dr. Young denied the child having such disease. Dr. Young told the officers that fracture to the child's arm was severe, causing a lot of pain. The injury would have been very noticeable to anyone, since the child would not have moved his arm and would have cried in pain if it was manipulated while dressing or bathing him. Because these symptoms were not seen while the child was at the maternal grandmother's house, Dr. Young opined that the injury occurred after the child returned home on October 30, 2012. When asked whether rolling over the child, dropping him six inches, or dropping him four feet from overhead and catching him by one arm, could cause the arm fracture, she said none of those actions would produce enough twisting force needed to cause the arm injury. Dr. Young said the rib fractures were caused by someone squeezing the child, but since she could not date the rib injuries, they could have occurred any time in the weeks before the doctor's appointment.

---

[5] The number of rib fractures is unclear, since the initial report indicated there was one, but later reports indicated more than one.

When confronted with evidence of the child's past ankle fracture and rib fracture(s), father said he did not "feel that the test results were very clear." He denied causing the child's injuries. The interviewing officer asked if he would take a polygraph examination, and father agreed. During the test, father was asked if he caused the injury to the child's arm, and father said no. The polygraph showed that father was not telling the truth when he answered that question. When confronted with the polygraph results, father admitted that he lied. He then said he accidentally dropped the child six to 12 inches and caught him by his arm. Father went over the events of the evening prior to the doctor's appointment and said the child seemed irritated. The child would not take his bottle at first, but eventually did. Mother took a shower that evening, and during that time, father played with the child and dropped him. The following morning when the parents gave the child a bath, they noticed that it "bugged" him when they washed his right arm. They decided to ask the doctor about it at his appointment. When asked about the other injuries, father said he could not think of anything that would have caused them. He said the child's ankle was possibly injured when he (father) "flopped" on the couch next to the child and hit the child's ankle with his arm.

A contested jurisdiction/disposition hearing was held on February 5, 2013. Mother testified that she had no explanation for the child's injuries, except the arm fracture. She said the arm fracture could have happened when father was playing with the child. She had no idea who broke the child's rib(s), but did not think father did it. Mother also testified that when she picked up the child at 4:00 p.m. on October 30, 2012, from her mother's house, the child was fine. She said she first noticed that his arm

8

appeared to be injured when she was bathing him before the doctor's appointment the next morning. She agreed that the child's arm was broken sometime between 4:00 p.m. on October 30, 2012, and 8:00 a.m. on October 31, 2012. Father was called to testify but invoked his Fifth Amendment right to refuse to answer questions, due to his criminal charges. The social worker also testified and said it was not in the best interest of the child to offer services to the parents. She opined that their failure to accept responsibility was a good indicator that there would be a continued risk to the child if he was to be returned to them.

After hearing oral argument and reviewing the reports and documents submitted, the trial court found that the child came within section 300, subdivisions (a), (b), and (e), and declared him a dependent of the court. The court found father to be the presumed father of the child. The court stated that the parents only wanted to "sit back and claim accidents, or [that they did not] know, or it [was] a disease without any evidence . . . ." The court then denied reunification services to both parents pursuant to section 361.5, subdivision (b)(5), noting that neither of them had admitted any abuse and that they were covering for each other. The court also found that neither parent had shown that services would prevent reabuse. The court set a section 366.26 hearing and authorized CFS to place the child in a prospective concurrent planning home pending the hearing.

Father filed a writ petition, which we denied in an unpublished opinion. Mother's writ petition was dismissed based on a no-issue letter from her counsel. On March 11, 2013, Father substituted Valerie Ross to replace his counsel, David Booth. The first addendum report prepared for the March 19, 2013, contested placement hearing

9

recommended that the child be placed in the concurrent plan home under a court-ordered permanent plan of adoption. The maternal grandparents were ruled out for placement because the social worker feared the child would be at risk of further injury or abuse due to their willingness to believe the injuries were accidental and minimal, along with their inability to articulate a clear plan of how they would protect the child if the parents requested to take him without supervision. The court heard the testimony of the maternal grandmother and considered the argument of counsel. In denying placement with either set of grandparents, the trial court observed: "[T]he Court is not convinced that either of those two sides of the family can provide a safe, secure, and stable environment for the child; that they can exercise proper and effective care and control of the child; that they can provide the home and necessities of life for the child; protect the child from the parents, which is most important here, and to make sure, basically, that the child is safe."

On July 26, 2013, both parents filed a joint section 388 petition. The changes asserted included their completion of parenting and anger management classes, and another doctor's opinion that the child was not abused. The petition claimed the doctor's opinion was new evidence that supported setting aside the dispositional order. On August 6, 2013, at the outset of the section 366.26 hearing, the trial court considered the parents' joint section 388 petition. CFS and the child's counsel opposed the petition. As to whether a prima facie case had been established, they pointed out that all of the medical evidence had been available to the parties much earlier, at the time of the jurisdiction/disposition hearing, and the parents failed to show that "reasonable diligence

was made with respect to getting the information at the time of the trial," or to provide a satisfactory explanation why they failed to produce it at that time.

The trial court denied the section 388 petition, concluding, "What you have offered here is a potential different interpretation that could easily have been presented at JD." The court added that the new evidence "merely offers speculation, so the request does not state new evidence or change of circumstances."

The trial court then terminated parental rights over the parents' objections; however, neither parent testified or offered evidence.

### B. Summary Taken From E059947 (Involving Z.S.)

On July 22, 2013, CFS filed a section 300 petition on behalf of Z.S., who was two months old at the time. Father is the presumed father. The petition alleged the child came within the provisions of section 300, subdivisions (b) and (j), because he was at risk for abuse based on K.S.'s physical abuse and the previous no-family reunification order for the parents. The child was placed in the same foster home as his brother, K.S. On July 23, Z.S. was ordered temporarily detained. The first parental visit went well; the child was healthy, happy, and developmentally on track, and the foster parents wanted to be considered for adoption.

The jurisdiction/disposition report filed on August 9, 2013, recommended no family reunification services be offered to either parent. Three grounds were alleged to bypass services, namely, section 361.5, subdivision (b)(7) (parent was denied services as to the child's sibling), subdivision (b)(10) (parent failed to reunify with the child's sibling), and subdivision (b)(11) (parent's parental rights over child's sibling were

11

terminated). Father claimed that three professionals would corroborate his "accident" theory regarding K.S.'s injuries. The parents were still living together.

On September 9, 2013, CFS filed with the court the same sheriff's investigation report that had been introduced as evidence in K.S.'s jurisdiction/disposition hearing. The next day, Father filed his substitution of attorney, identifying Carin L. Johnson as his trial counsel. At Ms. Johnson's request, the contested jurisdiction hearing was continued to October 8, 2013. On September 17, mother's counsel was relieved based on a conflict of interest, and David Levy was appointed as her counsel.

Prior to the hearing, father submitted a proposed trial brief and exhibits from Dr. Charles J. Hyman and Dr. Thomas Grogan. Father hoped to disprove the section 300, subdivision (e) allegation as to K.S. based on evidence that all of his injuries occurred at the same time and at a location far from the parents and unknowing to the parents.

On October 7 and 8, 2013, the trial court conducted Z.S.'s jurisdiction/disposition hearing. Father's counsel, Ms. Johnson, informed the court that Dr. Grogan would testify that "just because there is a spiral fracture does not mean, per se, abuse without question." Rather, the doctor would testify that, given the time of the spiral fracture, it could have occurred accidentally by someone else. Ms. Johnson wanted to cross-examine Dr. Young about the timing of the rib fractures and to discover her credentials in bone science. Finally, Ms. Johnson offered that Dr. Hyman would testify that a four-month-old child's bones are different from another four-month-old child's bones, such that a generalized opinion that certain fractures resulted from abuse is not possible. The doctor would also state that K.S. did not have any ankle fracture. Mother's counsel

12

joined in Ms. Johnson's request to offer the above testimony so that mother could determine whether K.S.'s injuries were accidental or deliberate, and could weigh that information in deciding whether she should stay with father.

Counsel for CFS and the child objected to the proposed medical testimony on the grounds of collateral estoppel. Citing *In re Joshua J.* (1995) 39 Cal.App.4th 984, counsel argued that the allegations involving K.S.'s injuries were adjudicated and found to be true. They asserted that while father had a right to litigate the issue of current risk to Z.S., he had no right to "backdoor" new evidence about K.S. into Z.S.'s case.

In response, Ms. Johnson asserted that father received incompetent representation of counsel, because counsel (Mr. Booth) had failed to obtain a second medical opinion to challenge Dr. Young's opinion. Ms. Johnson expressed concern that the trial court did not have all the evidence before it to make an informed decision. She noted that the section 388 petition, which attempted to introduce a contradicting medical opinion, was denied and she opined there would likely be a writ of habeas corpus.

The trial court denied father's request to call medical experts because there was "a final judgment on the merits of [K.S.'s] case . . . [and father is] collaterally estopped."

CFS moved various reports into evidence and asked the court to "take judicial notice of [K.S.'s] case." Ms. Johnson objected, based on lack of notice. Two social workers testified at the hearing. Both expressed concern that the child appeared to be at risk because the parents were still cohabitating and neither had shown any responsibility for what had happened to the child's sibling. Although there were no "immediate, that-day, safety issues," the social worker returned the day of her initial visit with a detention

13

warrant. After removal, visitation between the child and the parents went well, and one of the social workers opined there was a bond between them. Nonetheless, CFS was concerned about the future risk of harm to Z.S., given the parents' continued insistence that K.S.'s injuries were accidental, not abuse.

Father and mother submitted their certificates of completion for parenting and anger management classes, which they had obtained in April 2013. Mother testified. She stated that she now believed father had caused K.S.'s injuries and she bore some responsibility for failing to supervise his rough playing with the child. If she had Z.S. in her care, she would not allow father to be alone with him. Mother acknowledged father's anger problems but maintained he had changed. Though mother was still living with father, she testified that she would leave him and move in with her mother if necessary to get her children back.

Father's counsel argued that Z.S.'s case should be dismissed, or at the very least, the child should be returned to the parents under a plan of family maintenance with court supervision. Counsel pointed out the differences in how father was behaving towards Z.S. when compared to his prior behavior with K.S. Mother's counsel acknowledged that mother was young, 20 years old, and she failed to stand up to father regarding his actions towards K.S.; however, "[t]his is what . . . would be the benefit of counseling; that she would get more of a backbone and be able to stand up a little stronger." The court noted that mother had changed in her view of father's actions and assured counsel that it did not want him to "try the old case." Counsel analogized mother standing up for father to situations where politicians' wives stand up next to them. He explained that she, like

14

politicians' wives, do so because "they had their dream." However, if leaving father and "abandoning her dream for the perfect white-picket fence with the house and family and kids" is necessary to get her children back, she is willing to do it.

Counsel for the child and CFS argued there was a preponderance of evidence to support the allegation that there is a substantial risk of physical harm to Z.S., who was only a few months old and unable to protect himself. Counsel pointed out that K.S. was "able to remain safely with his parents for about the same amount of time as [Z.S.] did prior to his removal . . . ." Both counsel argued for no reunification of services pursuant to section 361.5, subdivision (b)(7), (b)(10) and (b)(11).

The trial court denied father's motion to dismiss pursuant to section 355.1. It then sustained the allegations of the petition, noting the previous order terminating parental rights as to a sibling. Recognizing that mother is really the only parent who has a chance of reunifying with Z.S., the court ordered reunification services for her but denied them as to father. The court observed, "Mother's 20 years old. She is [*sic*] always appeared to the Court as somewhat—I hate to use these words, but I'm going to—weak. Her mother was here last time during the trial, and I think it was partly her upbringing. She has never really stood up for herself, and I can't teach her that. She is going to have to learn that on her own. . . . [¶] The father has engaged in services pending this case . . . however, the Court doesn't see an opportunity or positive feeling or anything from the father that I think that he can engage in reunification services and be successful." The court urged mother to separate from father and show that she can be protective of her children. A section 366.21, subdivision (e) hearing was set.

15

Father's counsel indicated father's intent to pursue services on his own with a plan of later filing a section 388 petition. Thus, counsel asked if CFS could informally provide a list of services. Recognizing that it would be easier for father if CFS were to offer services to him, the court stated: "I don't think it would do any good at this point. I think Mother needs to focus, and she needs to focus on one thing. I don't want them going to services together. I don't want them visiting the child together. I don't want anything together because she needs to stand up and prove herself. It has to be on her." Separate, supervised visitation was ordered for both parents and Z.S. was placed in the same concurrent planning home as his brother.

## II. DISCUSSION

### A. Ineffective Assistance of Counsel

Father contends that because he received IAC at the initial critical stages of K.S.'s dependency, he suffered termination of his parental rights for K.S. and denial of reunification services for Z.S. More specifically, he claims the trial court lacked contradictory medical evidence in order to fully consider CFS's claim that K.S.'s injuries resulted from child abuse. He further faults his counsel for being unprepared and failing to cross-examine the witnesses against him, including Dr. Young. He asserts that he was "prejudiced by this because with a true finding, his name will appear on the child abuse index and may and will affect him in the future if he were to have other children, as it did when his second son was born."

At the outset, CFS argues that we should not consider father's IAC claim on the grounds that he is unable to raise this issue in a direct appeal and his habeas corpus

petition was untimely. In any case, however, CFS offers sound reasoning why the claim fails on its merits.

Section 317.5, subdivision (a), provides: "All parties who are represented by counsel at dependency proceedings shall be entitled to competent counsel." In order to establish that counsel in a dependency proceeding was ineffective, "a parent 'MUST DEMONSTRATE BOTH THAT: (1) his appointed counsel failed to act in a manner expected of reasonably competent attorneys acting as diligent advocates; and that (2) this failure made a determinative difference in the outcome, rendering the proceedings fundamentally unfair in that it is reasonably probable that but for such failure, a determination more favorable for [the parent's] interests would have resulted.' [Citations.] In short, [the parent] has the burden of proving both that his attorney's representation was deficient and that this deficiency resulted in prejudice. [Citation.]" (*In re Dennis H.* (2001) 88 Cal.App.4th 94, 98, original capitalization.)

"A court need not evaluate whether counsel's performance was deficient before examining prejudice suffered by defendant. [Citation.] Thus, a court may reject a claim if the party fails to demonstrate that but for trial counsel's failings, the result would have been more favorable to the defendant. [Citation.]" (*In re Nada R.* (2001) 89 Cal.App.4th 1166, 1180.)

Here, we assume counsel's performance was deficient and focus our analysis on whether father has made a showing of prejudice. (*In re Eileen A.* (2000) 84 Cal.App.4th 1248, 1259-1260, overruled on other grounds in *In re Zeth S.* (2003) 31 Cal.4th 396, 413-414.)

17

According to father, his counsel's failure to cross-examine Dr. Young, to seek and introduce "expert testimony on complicated issues of bone fragility and callous formation (dating fractures)," and "to rule out other causes for the injuries," resulted in prejudice. In order to analyze father's claim, we consider the evidence relied upon by the trial court in making its findings, along with the expert evidence which father has submitted with his writ petition.

Following a wellness checkup, K.S. was initially seen at Loma Linda by Dr. Andrea Wagner Thorp. Dr. Thorp noted that the child suffered a "spiral fracture of distal right humerus, nondisplaced," and a "2mm of midline shift to the right at the level of the septum pellucidum." She did not exclude the child may also be suffering from a cerebral edema. Dr. Thorp's report also noted that "Grandmother was overheard by CPS to be telling parents to 'deny everything.'" A bone survey conducted on November 1, 2012, disclosed "[c]ortical irregularity . . . of the posterior left distal tibial metaphysis with surrounding periosteal reaction," and "[c]ortical irregularity . . . in the posterior aspect of the left seventh rib." The attending radiologist agreed with the findings. That same day, Dr. Amy Young examined K.S. and noted that he suffered "(1) [a]cute spiral fracture of the right humerus, (2) [p]robable fracture of the distal left tibial met[a]physis, [and] (3) [i]rregularity of ribs on left—suspect fractures (healing)." She concluded the child's injures were consistent with child abuse. A bone survey conducted on November 19, 2012, noted a healing spiral fracture of the right humerus and healing fractures of the left posterior seventh and right posterior ninth and 10th ribs, approximately three weeks in age. On December 28, 2012, Dr. Young informed CFS that

18

K.S.'s fracture to the right humerus was "an inflicted injury, consistent with child abuse." Regarding the rib fractures, Dr. Young opined they were consistent with "squeezing of the rib cage" and child abuse. As for the metaphseal fracture of the distal left tibia, she opined that it resulted from "yanking or pulling of an extremity."

In contrast to Dr. Young's opinion, Dr. Charles J. Hyman, a board certified pediatrician and expert witness, reviewed K.S.'s medical records and spoke with father in July 2013. He opined that K.S. "was not abused and had medical explanations for his findings." He stated there "is no fracture that cannot also be seen in accidental injuries." He claimed that "[n]either radiologists nor child abuse pediatricians (THEY) can diagnose child abuse by interpreting plain x-rays. . . . THEY certainly cannot know whether the forces were applied in an abusive or a non-abusive manner." According to Dr. Hyman, K.S. met the "clinical diagnostic criteria for bone fragility . . . a diagnosis that supports the parents' history." However, the doctor did "not have the medical records from Loma Linda University to see what was done to evaluate [K.S.'s] bone strength." Dr. Hyman spoke to father, who said that he was playing "Superman" with K.S., and K.S. "slipped out of the father's hand feet-first," which caused father to catch the child's right arm, jerking K.S. towards father's body, and the father compressed the child against his waist to keep the child from hitting the ground.

Dr. Thomas J. Grogan reviewed K.S.'s medication records and opined that the fractures he had received "could certainly have occurred with someone losing control of the child, grasping the right arm when the child started to slip or fall, and grasping the child around the child's waist in an effort to control the child from slipping further.

19

Dr. Grogan stated that "[a]lthough it is impossible to rule out the intent behind these injuries; these injuries all appear to have occurred at one time, and most importantly, even if left untreated, would have gone onto pure, uneventful healing without deformity, disfigurement or dysfunction."

Dr. David E. Raymond provided expert evidence on the biomechanics of spiral fractures. He explained that "[f]racture patterns are not necessarily diagnostic as to whether an injury was caused by accidental or non-accidental trauma." He "had found no available pediatric tolerance data relative to torsional loading of a four-month-old child," and thus, he was unable to state the amount of torsion required to fracture K.S.'s humerus. He concluded: "As to the scenario described by [father], torsional loading of [K.S.]'s arm cannot be ruled out at the moment [father] grabbed his elbow. This, theoretically, would have developed as a result of inertial loading from [K.S.]'s own momentum in addition to any added force from [father's] attempt to prevent [K.S.] from striking the ground. However, a more thorough analysis would be required . . . to determine whether the fracture is consistent or inconsistent with the given scenario."

While father's expert testimony raises questions regarding the cause of K.S.'s injuries, the fact remains that father failed to be forthcoming about his actions when initially confronted and throughout K.S.'s jurisdiction/disposition hearing. In addition to father's omission of the truth, along with Dr. Young's report and opinion, the trial court was presented with a sheriff's department investigation of the incident. Both parents denied knowing the cause of K.S.'s injuries. Father claimed that mother never left the baby alone with him and that they all slept together. When specifically asked if he could

20

have accidentally hurt the baby while playing with him, father said "no," and that "[t]he only thing he could think of that would have hurt [K.S. was] when he lay in bed with them and if one of them had rolled over onto him." A polygraph test indicated father was not being truthful in answering questions about K.S.'s injuries. Thus, a deputy further questioned father, who admitted playing rough with the baby and causing his injuries. Father provided four different scenarios of how K.S. was injured. The maternal grandmother told the officer that the parents "argued[d] all the time," and said that father was "rough with the baby." She had once seen mother with a black eye, which she suspected was inflicted by father; however, she had not seen father hit mother. The maternal step-grandfather confirmed the grandmother's observations.

The sheriff's department interviewed father's ex-girlfriend's mother, who said that father had hit his ex-girlfriend and had a short temper. The ex-girlfriend described father as having a "horrible temper" and being physically abusive to her. She feared him being alone with the children, getting frustrated and hurting them. She described his extreme anger issues by recounting his reaction when she forgot to get him ranch dressing for a meal. She explained that he "threw [her] head into the side of the driver door." She refused to let him drive with their children because when he got mad, he would "intentionally drive into oncoming traffic." Father's criminal history included reports for domestic battery and domestic disturbance. Dr. Young informed the detective that K.S.'s injury to his arm would have been "very noticeable," because he would not have moved his arm and he would have cried in pain if the arm was manipulated while dressing or bathing him. When the deputy interviewed mother, she cried and said she wanted to be

21

with father and her child. She described them as her family and explained that because her biological father did not have a role in her life, it upset her. Family was the most important thing to her and she wanted to marry father and have more children. She did not believe her son was injured in father's care. Upon counsel's advice, mother declined to take a polygraph test.

When the trial court decided to deny reunification services to father and mother pursuant to section 361.5, subdivision (b)(5), it noted that neither of them had admitted any abuse and that they were "covering for each other." The court stated the parents wanted to "just sit back and claim accidents, or [that they did not] know, or it [was] a disease without any evidence . . . ." Thus, the court found that neither parent had shown that services would prevent reabuse. While father's experts' opinions may have brought into question the issue of intentional child abuse, they did not rule it out. Thus, we do not find it reasonably probable that the trial court would have reached a different result. Clearly, K.S. was injured at the hands of father. Even father's experts agreed on this point. Clear and convincing evidence supported the trial court's decision to deny services. (§ 361.5, subd. (b)(5).) Moreover, the trial court recognized that the crux of the problem was the parents' failure to recognize father's abusive behavior, whether accidental or intentional, as the source of K.S.'s injuries. In order to prevent future abuse, the parents must acknowledge the action that caused the injuries to be improper, whether accidental or intentional. At the time of the jurisdiction/disposition hearing, the parents were unwilling to do so.

In short, father has failed to demonstrate a prima facie case of prejudicial ineffective assistance.

## B. Bypassing Reunification Services for Father in Z.S.'s Case

Father faults the trial court for bootstrapping its decision to deny reunification services to him in Z.S.'s case to the findings in K.S.'s case. He asserts the findings of child abuse with respect to K.S.'s case should not have been ruled as res judicata or collateral estoppel in Z.S.'s case, because there was no showing that Z.S. was in danger or at any risk, and there was no finding on the merits in K.S.'s case due to counsel's IAC. Finally, father claims that the court failed to make the requisite findings under section 361.5, subdivisions (b)(7), (b)(10), and (b)(11), to deny reunification services to him with respect to Z.S.

When a child is removed from parental custody, the juvenile court is required to order reunification services to assist the parents in reuniting with the child. (§ 361.5, subd. (a).) However, if certain of the circumstances set forth in subdivision (b) of section 361.5 are established, "the general rule favoring reunification is replaced by a legislative assumption that offering [reunification] services would be an unwise use of governmental resources. [Citation.]" (*In re Baby Boy H.* (1998) 63 Cal.App.4th 470, 478.)

As relevant here, services may be denied if the court finds by clear and convincing evidence "[t]hat the parent is not receiving reunification services for a sibling . . . ."; "[t]hat the court ordered termination of reunification services for any siblings . . . of the child because the parent . . . failed to reunify with the sibling . . . after the sibling . . . had been removed from that parent . . . and that, according to the *findings of the court*, this

23

parent . . . has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling . . . of that child from that parent . . . .”; or “[t]hat the parental rights of a parent over any sibling . . . of the child had been permanently severed, and this parent is the same parent described in subdivision (a), and that, according to the *findings of the court*, this parent has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling . . . of that child from the parent.”  (§ 361.5, subds. (b)(7), (b)(10), & (b)(11), italics added.)  Father contends the trial court failed to make the necessary findings under section 361.5, subdivision (b), and merely bootstrapped Z.S. case to that of K.S.  We disagree.

“The ‘reasonable effort to treat’ standard ‘is not synonymous with “cure.”’ [Citation.]  The statute provides a ‘parent who has worked toward correcting his or her problems an opportunity to have that fact taken into consideration in subsequent proceedings.’ [Citation.]  To be reasonable, the parent’s efforts must be more than ‘lackadaisical or half-hearted.’ [Citation.]” (*K.C. v. Superior Court* (2010) 182 Cal.App.4th 1388, 1393.)  Here, the problems that led to removal of Z.S.’s sibling were father’s abusive handling of the sibling and the parents’ refusal to acknowledge it.  While the parents are to be commended for taking parenting and anger management classes, it appears their motivation in doing so was not based on an acknowledgement and acceptance that there was a problem.

Mother testified at the hearing; however, father did not.  Mother admitted that she now believed father’s actions towards K.S. had been reckless and she was willing to move out of father’s home in order to get her child back.  In contrast, father never offered

24

the court an opportunity to evaluate whether or not he would benefit from services. The fact that he expressed concern over Z.S.'s reaction to a specific formula or that his supervised visitation went well are irrelevant to the issue of whether he understood the gravity of his prior actions towards K.S. Instead of owning up to the cause of K.S.'s injuries, father continued to suggest that K.S. had brittle bone disease or that his injuries were accidental and thus failed to support a finding of child abuse. Father resisted taking responsibility for his actions, and mother was reluctant to accept the fact that father's handling of K.S. was abusive. CFS intervened in Z.S.'s case because of father's inability to recognize or appreciate the risk to Z.S. posed by his physical treatment of K.S. Overall, his efforts to address the issues which caused him to handle K.S. in an abusive manner were, at best, minimal.

Thus, the court opined that it did not see "an opportunity or positive feeling or anything from the father that . . . he can engage in reunification services and be successful." Furthermore, the court observed mother to be "weak" and in need of breaking free from father in order to learn the skills necessary to stand up for herself and her children. The court was adamant that the parents not attend services together and not visit the child together. The court's statements and observation establish its implied findings supporting its decision to deny father services pursuant to 361.5, subdivisions (b)(7), (b)(10), and (b)(11).

Based on the above, we reject father's claim that the court merely bootstrapped Z.S.'s case. Furthermore, as we have already noted, father has failed to demonstrate a prima facie case of prejudicial IAC.

25

## III.  DISPOSITION

The orders are affirmed.  The stay of the juvenile court proceedings previously imposed is hereby vacated.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

    HOLLENHORST

Acting P. J.

We concur:

    MCKINSTER

J.

    RICHLI

J.