Filed 3/23/16  In re C.B. CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re C.B., a Person Coming Under the Juvenile Court Law. | |
| HUMBOLDT COUNTY DEPARTMENT OF HEALTH AND HUMAN SERVICES,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>C.A.,<br><br>    Defendant and Appellant. | A144687<br><br>(Humboldt County<br>Super. Ct. No. JV150033) |

C.A. (Mother), mother of one-year-old C.B., appeals from the juvenile court's jurisdictional and dispositional orders removing C.B. from her and presumed father P.B.'s (Father) care.[1]  She contends there was insufficient evidence to support the court's findings.  We reject the contention and affirm the orders.[2]

---

[1]Father has not challenged the orders and is not a party to this appeal.

[2]The Department has filed a request for judicial notice of various orders and petitions filed after the jurisdictional and dispositional orders were issued.  Because this postjudgment evidence was not before the juvenile court and no extraordinary circumstances are presented, we deny the request.  (*In re Zeth S.* (2003) 31 Cal.4th 396, 400, 405–407; *In re Robert A.* (2007) 147 Cal.App.4th 982, 990.)

FACTUAL AND PROCEDURAL BACKGROUND

On February 3, 2015, Humboldt County Department of Health and Human Services (the Department) filed a petition on behalf of then-three-week-old C.B., alleging she was at substantial risk of serious harm because Mother and Father were unable to meet her immediate needs for supervision, food, and health care.  C.B. was suffering from serious medical issues including not being properly fed and being exposed to a serious virus after being informed by medical staff of the dangers this posed.  Mother consistently used alcohol and methamphetamine during her pregnancy, and Father had a history of substance abuse.  A dependency had been established as to C.B.'s sibling due to Mother's substance abuse and inability to meet the sibling's needs.  She had failed to complete the terms of her case plan as to the sibling, and the case had closed in August 2014, with sole custody to Father.

A February 4, 2015 detention report set forth the family's child welfare history.  According to the report, C.B.'s sibling, R.B., was detained on March 14, 2013, after she was born prematurely and tested positive for amphetamines at birth.  Mother had an extensive history with alcohol and methamphetamine abuse and tested positive for both of these substances multiple times during her prenatal visits.  Mother did not wake up when R.B. cried, could not recognize when R.B. was turning blue and unable to breathe, and fell asleep on R.B. in a way that caused R.B. to nearly fall under the rails of the hospital bed.  Jurisdiction was also based on Father's inability or unwillingness to protect R.B. from Mother's conduct.  Mother completed an in-patient program but failed to engage in after care services.  She failed to communicate with the Department and her whereabouts became unknown.  The case was closed, with R.B. being returned to Father with family maintenance services.

The detention report stated as to C.B. that she was born in a hospital in Oregon while Mother was there visiting.  Birth records showed Mother drank a "pint of hard alcohol daily" pre-pregnancy, and "a pint of beer daily through pregnancy."  She admitted to "snorting meth during early pregnancy" and said she had smoked "0.5 packs/day for 15 years."  She stated she had depression for which she had been taking

2

antidepressants. C.B. was readmitted to the hospital on January 30, 2015, and was in the Neonatal Intensive Care Unit (NICU) for failure to thrive, bronchiolitis, pneumonia, a heart murmur, and a wound on her foot. A nurse observed Mother feeding C.B. a bottle of water and told Mother that she needs to feed C.B. calories so she can gain weight. Mother became defensive and said she has done this with her other children and it "hasn't killed any of them yet." Hospital staff also learned that R.B. had been diagnosed with respiratory syncytial virus (RSV). Despite being advised that C.B. should not be exposed to this contagious disease, the parents allowed R.B. to kiss C.B. on the face.

Mother had a criminal history including a conviction for possession of a controlled substance and arrests for infliction of corporal injury on a spouse/cohabitant, disorderly conduct, violation of a court order to prevent domestic violence, and spousal/domestic battery. Father had a criminal conviction for infliction of corporal injury on a spouse/cohabitant and arrests for child endangerment, infliction of corporal injury on a spouse/cohabitant, violation of court order to prevent domestic violence, and possession of a controlled substance and paraphernalia.

A February 17, 2015 addendum to the detention report stated that Mother's aunt believed Mother was still drinking alcohol. The aunt stated that before Mother and Father went to Oregon, when Mother was still pregnant with C.B., she saw a bottle of "hard liquor" in Mother's purse. Mother's uncle said the hard liquor was whiskey and that Mother "is the worst kind" of drunk "because she gets angry," and that there is a lot of arguing in Mother and Father's house. C.B.'s attending physician reported that C.B. was not feeding well and required constant monitoring to support feedings. She was in the hospital for failure to thrive and a possible heart murmur. She had also been diagnosed with cellulitis, a common but potentially serious bacterial skin infection. C.B.'s attending physician believed that the severity of C.B.'s medical issues was "related to her current immunocompromised status, related to Failure to Thrive."

At a contested detention hearing, a public health nurse testified that C.B. was admitted to the NICU for further assessment of her failure to thrive diagnosis and heart murmur, and that she developed respiratory issues in the NICU. When asked whether

3

Mother's "self-reported alcohol use and methamphetamine use during the pregnancy" was a factor in C.B.'s failure to thrive diagnoses, she responded, "The infant was noted to have feeding difficulties. And in my experiences, infants exposed to methamphetamines in utero may have feeding difficulties." After reviewing the reports and hearing argument from counsel, the juvenile court declared C.B. a dependent.

According to jurisdiction and addendum reports filed March 2, 2015, Mother said during a meeting with Department social workers that she gave "a very little amount" of water to C.B., and that she generally did not give her water. She believed the nurse who asked her about the water was "judgmental," and that Mother "kn[ew] what she [was] doing." Mother appeared emotional and both parents said they did not see why the Department needed to be involved at all. When the social workers explained that C.B. was sick with multiple issues and needed to be in protective custody, the parents left the meeting upset.

The reports stated that a social worker spoke to C.B.'s emergency care provider, who said that Father "got in her face" on one occasion and grabbed R.B. out of her arms and took her away as R.B. screamed and cried. The care provider had recently smelled alcohol on the parents and no longer felt comfortable having supervised visits in her home for C.B. The social worker also spoke to a public health nurse who said she was unable to obtain C.B.'s prenatal records because the parents had refused to sign a release. The nurse, who had testified at the detention hearing, said she observed both parents sleeping during her testimony.

A review of records and conversations with the NICU nursing staff revealed that nurses observed a granular wound with necrosis on C.B.'s right ankle that had not previously been mentioned in the Oregon records. The staff also observed the parents feeding C.B. the same bottle of formula at 4:00 p.m. and again at 7:00 p.m. A NICU physician stated it was difficult to identify whether the parents were responsible for C.B.'s failure to thrive diagnosis, given the conflicting information, including whether she was given water, or how much she was given. The nurses informed the Department that Mother was not only seen giving water to the newborn, but had also admitted to

4

giving the baby water several times a day. Another nurse spoke to Father, who confirmed they fed C.B. water several times a day. Nursing staff also reported that both parents left the NICU at 9:00 p.m., saying they would be back after taking a shower and getting food, but did not return until 6:00 p.m. the next day. Mother was not engaged with C.B. when feeding her; Father was engaged throughout the feeding. Mother continued to refuse drug testing and refused to give access to her prenatal records.

Supplemental information was provided regarding the prior dependency involving R.B. Based on the timeline of C.B.'s conception and birth, the Department deduced that Father immediately allowed Mother back into the home as soon as the prior dependency case was closed, and was aware that Mother was still using alcohol and methamphetamines while pregnant. When a social worker asked Father about this, he claimed he was told by a social worker that Mother could move back into the home and resume parenting as soon as the case closed.

At a March 2, 2015 contested jurisdictional hearing, the juvenile court took the reports into evidence and heard argument from the parties before finding there was clear and convincing evidence to assume jurisdiction under section 300, subdivisions (b) and (j), based on Mother's inability to provide care to C.B. given her present substance abuse, as well as the unresolved parenting and substance abuse issues that caused her to lose custody of R.B. The court also found there was clear and convincing evidence to support jurisdiction based on Father's failure to protect C.B. from Mother's substance abuse.

In disposition and addendum reports filed March 23, 2015, the Department recommended that C.B. be declared a dependent of the court and removed from the parents' care, and that reunification services be provided to both parents. The parents continued to live together as a couple and intended to co-parent C.B. There was a history of domestic violence between the parents, resulting in arrests for both parents and a misdemeanor conviction for Father. The parents minimized the incidents, stating they were misunderstood. Mother continued to refuse drug testing and had not yet agreed to sign a release of information to access her prenatal records. There were still ongoing issues of inadequate or unsafe housing, substance abuse, and mental health concerns that

5

had not been addressed by either parent, despite the services that had been provided to them. C.B. was being cared for in the same relative placement in which she was originally placed and was doing well in the home. Mother and Father were being provided a minimum of two hour supervised visits, twice a week.

At a March 23, 2015 contested dispositional hearing,[3] Mother testified that she completed the Bonnie Brown in-patient program during R.B.'s dependency case, but did not fully participate in after care services. She stated she then relapsed by having "a drink once." She did not believe she needed any substance abuse or Alcohol or Drug (AOD) treatment because she used alcohol or drugs while pregnant with R.B., but "things were different" because she "went to the program. I did all those things, and I am a different person now." She testified she was visiting C.B. but had missed three visits in the last month.

A Department social worker testified that Mother refused to drug test and said she did not want to have an AOD assessment because she feared she would be ordered into another in-patient program. The social worker confirmed that Mother missed the last three visits with C.B. and that visitation had been suspended. C.B. was gaining weight and the frequency of her doctor visits had been reduced to every other week. He believed C.B. should not be returned to the parents' care until the parents participated in reunification services, given the ongoing concerns about their ability to care for C.B. and the unresolved substance abuse and domestic violence issues. He believed Mother was still using alcohol and/or drugs. He also reported that the Department was preparing to file non-detained petitions on behalf of R.B. and a half sibling, J.B.

The juvenile court stated, "it seems very clear that there would be substantial danger to the physical health, safety, protection of [C.B.] at this point if placed in the parents' care, and to say Father can simply care for the child with Mother with issues in

_____

[3]The dispositional hearing was originally calendared for March 12, 2015, but was continued after an individual named L.B. claimed he was C.B.'s biological father and requested a DNA test, which the court ordered. The DNA test was still pending as of the March 23, 2015 dispositional hearing.

6

the home I think ignores reality." The court stated it was basing its decision on Mother's failure to participate in services in the prior dependency and failure to address the issues that led to her losing custody of R.B., coupled with her refusal to acknowledge she had a substance abuse issue. The court found it "quite unquestionable the [M]other has long-standing, long untreated substance abuse issues that do present a substantial risk to the child." The court declared C.B. a dependent, removed her from her parents' care, and ordered reunification services for both parents.

## DISCUSSION

Mother contends there was insufficient evidence to support the findings under Welfare and Institutions Code, section 300, subdivisions (b) and (j).[4] We disagree.

" ' "In juvenile cases, . . . the power of an appellate court asked to assess the sufficiency of the evidence begins and ends with a determination as to whether or not there is any substantial evidence, whether or not contradicted, which will support the conclusion of the trier of fact. All conflicts must be resolved in favor of the respondent and all legitimate inferences indulged in to uphold the verdict, if possible." ' " (*In re Brison C.* (2000) 81 Cal.App.4th 1373, 1378–1379.) "If, on the entire record, there is substantial evidence to support the findings of the juvenile court, we uphold those findings." (*In re Megan S.* (2002) 104 Cal.App.4th 247, 250.)

### *Subdivision (b)*

Section 300, subdivision (b), provides that a juvenile court may assert jurisdiction over a child when the child "has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent . . . to adequately supervise or protect the child . . . or by the willful or negligent failure of the parent . . . to provide the child with adequate food, clothing, shelter, or medical treatment, or by the inability of the parent . . . to provide regular care for the child due to the parent's . . . mental illness, developmental disability, or substance abuse. . . ." Mother contends there was insufficient evidence to support the court's

_____

[4]All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

7

findings that she and Father were neglectful or caused any of C.B.'s medical issues, or that Mother was unable to provide regular care for C.B. due to her substance abuse issues.[5]

There was ample evidence in the record, however, from which the juvenile court could make these findings. Mother had a history of substance abuse and a conviction for possession of a controlled substance. She had a history of using drugs and alcohol during her pregnancy with R.B., and had a history of failing to protect and care for R.B. Birth records for C.B. showed that Mother drank a "pint of hard alcohol daily" pre-pregnancy and "a pint of beer daily through pregnancy." She admitted to "snorting meth during early pregnancy" and said she had smoked "0.5 packs/day for 15 years." Relatives reported that Mother was drinking alcohol during her pregnancy with C.B. and had a bottle of "hard liquor" in her purse shortly before she went to Oregon and gave birth to C.B. She refused to disclose her prenatal history, and refused to drug test. She told a Department social worker that she did not want to have an AOD assessment because she feared she would be ordered into another in-patient program. Despite her admissions regarding drug and alcohol use, she denied she needed any substance abuse treatment and said during a meeting with social workers that she did not understand why the Department needed to be involved.

C.B. was born prematurely and was observed grunting, with poor oxygen, saturation, and tachypnea. She lost weight in Mother's care and was hospitalized for failure to thrive. NICU records described her as "small, tired appearing, having limited

---

[5]The Department argues that Mother's appeal is moot because Father did not challenge the allegations and has not filed an appeal. It is true that a "minor is a dependent if the actions of either parent bring her within one of the statutory definitions of dependent," (*In re Alysha S.* (1996) 51 Cal.App.4th 393, 397), but here, Mother challenges all of the allegations that were made against both her and Father. Moreover, the sustained jurisdictional and dispositional findings against Mother had an adverse effect on her rights and will affect her in subsequent proceedings. Her challenge to those findings is therefore not moot. (*In re Joshua C.* (1994) 24 Cal.App.4th 1544, 1547 [appeals in dependency matters are not moot if any error affects the outcome of subsequent proceedings].)

eye contact, heart murmur, and to be slightly hypotonic." Mother gave water to C.B. even after being informed about its detrimental effects, and exposed her to RSV even after being told to keep her children apart. A public health nurse testified that the failure to thrive diagnosis was likely non-organic and that infants exposed to methamphetamines in utero may have feeding difficulties. A NICU doctor believed the severity of C.B.'s symptoms were related to her immunocompromised status. Although there was some conflicting testimony as to whether C.B.'s failure to thrive diagnosis was caused by Mother, the juvenile court could reasonably determine, in light of the above evidence, that her drug and alcohol use during pregnancy and her failure to take direction from hospital providers regarding appropriate newborn and infant care, contributed to or caused C.B.'s medical condition. (See, e.g., § 300.2 ["the provision of a home environment free from the negative effects of substance abuse is a necessary condition for the safety, protection and physical and emotional well-being of the child"]; *In re Drake M.* (2012) 211 Cal.App.4th 754, 767 [for children of tender years, substance abuse by a parent is prima facie evidence of risk]; *In re R.R.* (2010) 187 Cal.App.4th 1264, 1281 [affirming jurisdiction based upon medical records showing that parent admitted to medical staff that he had recently used methamphetamines].)

### *Subdivision (j)*

Section 300, subdivision (j), provides that a juvenile court may assert jurisdiction over a child when the "child's sibling has been abused or neglected, as defined in subdivision (a), (b), (d), (e), or (i), and there is a substantial risk that the child will be abused or neglected, as defined in those subdivisions." Mother argues that R.B. and C.B.'s cases were sufficiently dissimilar to each other so that the fact of a prior dependency adjudication as to R.B. did not mean C.B. was also at risk. She points out, for example, that R.B. was diagnosed with methamphetamine intrauterine exposure, while C.B. was not. She notes there was evidence she tested positive for alcohol and/or drugs during prenatal visits while pregnant with R.B., while there was no such evidence as to C.B., because she "exercised her right to privacy and did not sign a release for her prenatal records." She also argues as to subdivision (j) that the Department misled the

9

court into believing Mother had the burden of showing she had remedied the problems that had led to R.B.'s dependency, when in fact, it was the Department's burden to show she had not.

Having concluded there was substantial evidence to support the juvenile court's determination that C.B. came within the provision of section 300, subdivision (b), we need not address Mother's claims regarding subdivision (j). Section 300 contemplates that jurisdiction may be based on any single subdivision. (E.g., *In re Shelley J.* (1998) 68 Cal.App.4th 322, 330 [declining to address remaining allegations after one allegation found supported]; *Randi R. v. Superior Court* (1998) 64 Cal.App.4th 67, 72 [same].)[6]

**DISPOSITION**

The jurisdictional and dispositional orders are affirmed.

---

[6]Even if we were to address the merits of Mother's claims as to section 300, subdivision (j), we would conclude there was sufficient evidence to support the orders. It was undisputed that Mother had substance abuse issues that resulted in a dependency case for R.B., and that she failed to comply with her case plan and lost custody of R.B. Further, as noted, the Department presented sufficient evidence to meet its burden of showing that Mother's unresolved substance issues contributed or caused C.B.'s medical condition, and placed her at substantial risk of serious harm. (§ 300, subd. (j); *In re Joshua J.* (1995) 39 Cal.App.4th 984, 994 [two-prong test of subdivision (j) is satisfied where there is a showing of neglect of a sibling due to the parent's act or omission, and proof of substantial risk that another child—here, C.B.—is being, or will be, neglected].)

10

_____
McGuiness, P.J.

We concur:


_____
Siggins, J.


_____
Jenkins, J.


A144687, *In re C.B.*

11