Filed 12/30/20  In re A.A. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re A.A. et al., Persons Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E074882 |
| Plaintiff and Respondent, | (Super.Ct.No. RIJ1500121) |
| v. | OPINION |
| K.A., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Cheryl C. Murphy, Judge. Affirmed.

Nicole Williams, under appointment by the Court of Appeal, for Defendant and Appellant.

Gregory P. Priamos, County Counsel, James E. Brown, Anna M. Marchand and Prabhath D. Shettigar, Deputy County Counsel, for Plaintiff and Respondent.

1

## I. INTRODUCTION

Defendant and appellant, K.A. (Mother), and C.A. (Father), are the parents of five children born between 2012 and 2019. Mother appeals the February 7, 2020 dispositional orders, adjudicating the children dependents of the juvenile court under Welfare and Institutions Code, section 300, subdivision (b)(1),[1] and ordering respondent, Riverside County Department of Public Social Services (DPSS), to offer family maintenance services to the parents. Father did not appeal.

In this appeal, Mother challenges the sufficiency of the evidence supporting each of the court's jurisdictional findings—the "b-1," "b-2," and "b-3" findings. Mother further claims that collateral estoppel principles bar the juvenile court's adjudication of the b-2 finding, and that the juvenile court abused its discretion in ordering Mother to complete a parenting class and individual counseling as part of the family maintenance plan.

At Mother's request, we take judicial notice of the juvenile court's August 7, 2020 postjudgment order terminating its jurisdiction in this case. Although the children are no longer dependents of the court, Mother's appeal is not moot. Each of the court's jurisdictional findings concern Mother, and if insufficient evidence supports them, Mother would be a " 'non-offending' " parent, and this could affect her rights in subsequent dependency proceedings. (*In re Drake M.* (2012) 211 Cal.App.4th 754, 763.)

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

We conclude, however, that substantial evidence supports each of the court's jurisdictional findings, and we reject Mother's further claims of error. We, therefore, affirm the February 7, 2020 jurisdictional findings and dispositional orders.

## II. BACKGROUND

### A. *The 2015 Proceedings for A.A. and D.A.*

On January 31, 2015, DPSS received a referral alleging that the parents were generally neglecting their two young children, A.A. and D.A. That evening, Mother was arrested for driving under the influence (DUI) of alcohol and misdemeanor child endangerment. The California Highway Patrol (CHP) received a report of a possible drunk driver " 'weaving' through traffic." When the CHP located Mother's car, she was stopped because she had run out of gas and her blood-alcohol content was 0.21. A.A., then age two, and D.A., then age one, were in the car with Mother. Mother was breastfeeding D.A. without supplementing his meals with formula, and Mother was six weeks' pregnant with her third child, S.A.

The CHP officers took Mother and the children home to be placed in the care of Father until Mother became sober, but Father "appeared to be hesitant to accept responsibility for Mother and assume her custody." The CHP officers told Father that they were going to take Mother to an emergency room to be checked because she was pregnant, then they were going to book Mother into jail, and she would be released within several hours. Father said he noticed that D.A.'s vomit smelled of alcohol and that he was unaware, until recently, that Mother had been drinking. Mother appeared to be "very timid" about returning home and repeatedly said that Father was "not a nice guy."

According to the referral, the parents had a history of domestic violence, and Father had a prior arrest.

That evening, a DPSS social worker met with the parents and the children in the family's home in the presence of the CHP officers. The officers called DPSS because it appeared to them that Father could not care for the children without Mother; but while waiting for a social worker to arrive, Father properly attended to the children's needs. The parents gave the social worker permission to enter the home. Mother was "defensive and sarcastic" during the initial portion of the social worker's interview but later became cooperative. Mother said she was a " 'stay home Mom.' " She denied being an alcoholic and said Father had " 'ignored' " her and stayed in his office for most of that day. She then decided to take a drive with the children, purchased a " 'small bottle' " of vodka after she left the home, and drank it outside of her car.

Mother admitted making "poor choices such as drinking alcohol while pregnant and driving with her two young children while under the influence." She said she began drinking " 'a couple of months' " earlier due to stress, mostly caused by financial hardship and Father's unemployment. Mother denied having any mental health issues or current drug abuse. As a minor, Mother spent 18 months in the California Youth Authority for armed robbery. Mother was 35 years old in January 2015 and had no criminal record as an adult.

Mother also reported that Father had a 2013 arrest for domestic violence, but Mother denied any current domestic violence. She said that she and Father argued over various things, including their finances, and that Father was " 'edgy' " and "more

4

sensitive" due to not getting a job he had recently interviewed for. She denied being fearful of Father, but she said she did not know how Father would react when the CHP officers brought her and the children home. Father, however, was "calm and understanding" about the incident and was not angry with her. The parents had been married for more than seven years.

Father reported that he and Mother argued during the day on January 31, 2015, after A.A. had pushed D.A. while playing in the family's backyard. Father questioned A.A.'s action, and Mother said that A.A.'s behavior was age appropriate for a two-year-old. Father did not like the way Mother spoke to him and assumed that Mother was criticizing him for not knowing how to parent the children. He said he " 'shut down' " and went into his office for several hours. He later noticed that Mother and the children were not at home, and that Mother had left her cell phone at home. The CHP later called him and reported Mother's arrest.

Father was "shocked and disappointed" at Mother's behavior, and said that Mother drank knowing she was pregnant with their third child. Less than a month earlier, he discovered that Mother was drinking when he found several " 'empty and full' " cans or bottles of alcoholic beverages in the home. Father said he " 'once' " assumed that D.A.'s vomit smelled like alcohol, but Mother denied it when he brought it to her attention. He also knew that Mother breastfed D.A.

Father said that he and Mother argued " 'frequently' " and that their relationship suffered from " 'disrespect and lack of communication.' " Father opined that he and Mother needed "couple therapy" and Mother would benefit from an alcohol treatment

5

program. Father reported having a 2000 arrest for armed robbery when he was 19 years old, for which he served two years in prison and three years on parole. In 2013, Father was arrested for domestic violence following an argument with Mother, but he was released after two days without being charged. A.A. and D.A. had no visible marks or bruises.

On February 3, 2015, DPSS filed an "out of custody" petition for A.A. and D.A., under section 300, subdivision (b)(1). At a February 4 detention hearing, DPSS did not seek to detain the children outside the parents' custody, and the children were not detained. Still, the court placed several conditions on allowing the children to remain in the family home, including that there would be no alcohol in the home and that neither parent would consume any alcohol. The court also ordered the parents to cooperate with DPSS in its investigation.

At a jurisdiction hearing on March 27, 2015, the court sustained the allegations of an amended petition for A.A. and D.A., namely, that (1) on January 31, 2015, Mother was arrested for DUI and child endangerment; her blood-alcohol content was 0.21; and the children were with Mother in the car (the prior b-1 finding); (2) Mother "minimizes" her alcohol consumption and its effect on her ability to adequately parent the children (the prior b-2 finding); and (3) Father was *unaware* that Mother was caring for the children while under the influence of alcohol (the prior b-3 finding).

The court struck two other allegations, namely, that (1) Father had a history of perpetuating acts of domestic violence against Mother and that Father had a "self-disclosed" 2013 arrest for domestic violence (the prior b-4 allegation); and (2) Father had

6

a criminal history, including a prior armed robbery conviction (the prior b-5 allegation). The children remained in parental custody. At a September 25, 2015 review hearing, the court followed DPSS's recommendation and terminated its jurisdiction over A.A. and D.A.

By September 2015, Father was employed and the parents were soon expecting the delivery of their third child, S.A. That month, DPSS reported that Mother had completed most of her case plan, including individual counseling, parenting education, an online substance abuse program, and drug testing. In August 2015, Mother completed the "Safe-Care" in-home program. According to the nurse assigned to the family, Mother was "an exemplary client" and provided "appropriate care and structure" for the children. Regarding counseling, Mother's therapist diagnosed her with "Adjustment Disorder with Mixed Anxiety and Depressed Mood." Mother said she had benefited from her counseling by acquiring tools to enhance her problem solving and coping skills. Mother had also completed an outpatient substance abuse program and consistently tested negative for all controlled substances and alcohol.

DPSS also reported that Father had partially completed his case plan, which consisted solely of individual counseling. Father attended at least six counseling sessions with different therapists and was diagnosed with "Adjustment Disorder (unspecified)." One of Father's therapist's opined that Father "still ha[d] a lot of anger issues." Father was also "frustrated" with his counseling services because the counseling agency changed his therapist. His most recent therapist reported that he had "processed the incidents on his own" and had addressed them with his pastor. Mother reported that most

7

of the family's stressors were resolved because Father was no longer unemployed. Thus, Mother did not believe that Father needed further counseling.

During the February to September 2015 reporting period, the social worker was continually unable to contact Father. Still, the social worker reported that, although Father was "still resistant to therapy" and had not "successfully addressed the Department's concerns in counseling," Mother had consistently shown that she was "willing and able to provide a safe and nurturing home" for the children. Additionally, the parents had not had any altercations or domestic violence incidents involving law enforcement. Thus, the social worker opined that the family was stable and no longer needed services or juvenile court supervision.

On September 25, 2015, the court terminated its jurisdiction in the 2015 case. Thereafter, in October 2015, Mother was convicted of DUI based on the January 31, 2015 incident. Mother was sentenced to serve one day in jail and was placed on summary probation, which expired on June 14, 2019.

B. *Mother's Second Arrest for Child Endangerment (April 10, 2017)*

On August 10, 2017, DPSS received a referral alleging the parents' general neglect of A.A., D.A., and S.A. On the previous day, at 6:00 p.m., Father left the family home following an argument with Mother. Father returned home at 11:00 p.m., but he was unable to enter the home because he did not have a key. Father allegedly noticed that the family's car was gone and left the home on foot, looking for Mother. Father called the police and told them where Mother liked to "hangout." The police located Mother at 4:00 a.m., "asleep and drunk in the car," after Mother left the three children

8

"home alone." When the police entered the home, the children were asleep. Mother was "cite released" for child endangerment.

During DPSS's ensuing investigation, Mother said she had a few drinks on the night of August 10, 2017, and thought she had left the children at home with Father. Father said he thought that Mother had the children with her, but he later discovered that the children were at home alone, sleeping. The social worker noted that A.A., then age six, reportedly had speech delays, and that S.A., then age 22 months, had behavioral problems that prompted Mother to homeschool all three of the children. Mother also reported that she was pregnant again; she had "abstained from drinking alcohol"; she and Father had sought assistance from their church; and she was engaged in "recovery classes at her church." DPSS closed its 2017 investigation "as inconclusive for General Neglect."

Following a trial, in June 2018, Mother was convicted of misdemeanor disturbing the peace (Pen. Code, § 415) based on the August 10, 2017 incident, in which she was found drunk and passed out in her car. She was sentenced to four days in jail and was placed on summary probation, expiring on June 6, 2021.

C. *The Current Proceedings for the Children* (*2019-2020*)

On April 17, 2019, DPSS received a referral alleging that, on that day, Mother left her five young children in her running vehicle, a white Ford van, for approximately 30 minutes while she went into a store. A bystander saw the oldest three children, A.A., D.A., and S.A., jumping in the front seat of the van, honking the horn, revving the engine, and moving the steering wheel. Following a 911 call, a law enforcement officer

responded to the scene. Mother told the officer that she went into the store "real quick" and that her oldest child, then six-year-old A.A., was supposed to be watching the younger children: D.A., then age five; S.A., then age three; G.A., then age 16 months; and L.A., then age two months.

Mother also told the officer that she thought she was "legally allowed" to leave the children in the van, unattended. In his report, the officer wrote that Mother "displayed reckless disregard for the safety" of the children and cited Mother for misdemeanor child endangerment. (Pen. Code, § 273a, subd. (b).) The officer noted that a "computer records search" showed that Mother had a prior arrest for misdemeanor child endangerment.

On April 26 and 30, 2019, a DPSS social worker unsuccessfully attempted to contact the family at their home. On both occasions, the social worker went to the home, saw a white Ford van in the driveway, and knocked on the door, but no one answered. The social worker's subsequent attempts to reach the family at their telephone number on file with DPSS were also unsuccessful. On May 6, 2019, the social worker sent a certified letter to the family's home, asking the parents to contact her to schedule an appointment, but she received no response. Next, the social worker discovered where Father worked and attempted to contact him by phone and by a letter, sent by certified mail on May 20, 2019, to Father's place of employment. On June 4, the social worker left a voicemail message for Father at his place of employment, but she received no response.

On June 25, 2019, the social worker asked the Riverside County Sheriff's Department to conduct a welfare check on the family. Later that evening, a sheriff's deputy went to the home and reported that Mother was claiming she had not responded to DPSS because she had lost her cell phone. Father expressed concern about the reason DPSS wanted to contact him and asked why he had to talk with DPSS. The home met "minimal" standards, and the children showed no signs of abuse. The deputy gave the social worker Father's cell phone number, and the social worker called the number the next day, but no one answered.

On July 15, 2019, the social worker again attempted to contact the family at their home, but no one answered the door. The social worker left her card in the door with a note saying, "It is very IMPORTANT that I speak with you. Please call me." Still, the social worker received no response.

That same day, the social worker discovered that on July 10, 2019, a criminal complaint was filed against Mother based on the April 17, 2019 incident in which she left the children in her van, unattended. A preliminary hearing in Mother's 2019 criminal case, together with a hearing on her alleged probation violation stemming from the 2017 incident, was scheduled for August 14, 2019. Mother was on summary probation in connection with her 2017 criminal case. On August 14, 2019, a criminal protective order was issued, prohibiting Mother from leaving the children unsupervised and requiring her to have "no negative contact" with the children. Other hearings in Mother's criminal matters were continued to October 3, 2019.

11

On September 3, 2019, the social worker asked the sheriff's department to conduct a second welfare check on the family. Shortly after midnight on September 3, a sheriff's deputy called the social worker and reported that Father shut the door in the deputies' faces when they came to the family home to conduct the welfare check. While one of the deputies was reporting Father's actions by phone to the social worker, Father opened the door to the home, complained about the late hour, refused to call the social worker, and refused to allow the deputies to enter the home. The deputy put the social worker on a speaker phone, and the social worker explained to Father that she had made several attempts to contact him regarding the children. When the social worker explained that DPSS was concerned about Mother leaving the children in her van, unattended, Father said the social worker had "bad intel."

The social worker told Father that she knew about Mother's 2019 criminal case and had a copy of the police report for the April 2019 incident. Father said "they" were complying with the criminal case, but he refused to allow the social worker to meet with the children, either at the family's home or at DPSS offices. Father told the social worker that he had made "multiple attempts" to contact her, but the social worker "confronted" Father about "his dishonesty" and asked whether the parents still had the social worker's card. The social worker then heard a woman's voice say, "No." The social worker then explained to both parents that, due to the seriousness of the April 2019 incident and "the previous incident," it was possible for the juvenile court to become involved, but it would be better if the parents would meet with the social worker. Still, Father refused to meet with the social worker and said he would sue her if she involved the juvenile court.

DPSS then decided it would file a petition for the five children, given their young ages, the "apparent lack of benefit from previous services provided to the family," and given that the April 2019 incident was Mother's third "child endangerment encounter."

On September 16, 2019, DPSS filed an original petition for the five children, alleging juvenile court jurisdiction under section 300, subdivision (b)(1). In its detention report, DPSS opined that Mother appeared to have failed to benefit from the previous services provided through DPSS and the criminal court. Mother was on probation for the 2017 child endangerment incident when she was cited for child endangerment in April 2019. DPSS argued that Mother showed "an alarming lack of sound judgment" in April 2019 by leaving six-year-old A.A., who reportedly had some developmental delays, in charge of her younger siblings, including two-month-old L.A. DPSS reported that the parents had been uncooperative and had refused to allow the social worker to meet with them or to assess the children's safety. In June 2018, Mother was ordered to complete a parenting class as part of her probation in her 2017 criminal case, and on July 5, 2019, Mother submitted proof of her completion of a 52-week parenting class to DPSS. DPSS opined that the parents could benefit from counseling and from "intensive parenting services designed to specifically meet their needs to address identifying safety concerns in the home . . . ." DPSS sought family maintenance services for the parents.

On September 17, 2019, the court found that a prima facie showing had been made that the children were described in section 300, subdivision (b)(1), but did not detain the children. The court ordered the parents to cooperate with the social worker, to make the children available to DPSS "for inspection and interview," and to ensure the children's

13

welfare and safety. The court also ordered the parents not to use or to allow anyone else to use corporal punishment on the children.

On October 22, 2019, the social worker interviewed the parents together, at the parents' request, as the parents did not wish to be interviewed separately. The parents reluctantly provided information concerning their family histories, saying they had provided similar information in the 2015 dependency case. By this time, Father had been employed for nearly five years as an employment services counselor for a government agency. When asked about the family's support system, Father said that a paternal aunt had assisted the family, but she died in a car accident around one year earlier. The parents said there were five people from their church whom they "looked up to," but they did not trust any of those people to assist them with their children or to discuss "family stressors or struggles."

When asked about their family's strengths, Mother said, " 'We always do everything in our children's best interests,' " and said that the family shared meals and spent time together as a family. Father said that a " 'a strong faith in God' " was a family strength, and he believed it was important to teach the children " 'integrity, honesty, open communication and truth.' " Neither parent believed they could benefit from additional services, and both parents wanted the court to dismiss the current case. The parents also declined to participate in faith-based services.

On October 23, 2019, the social worker separately interviewed A.A., then age seven; D.A., then age five; and S.A., then age four, at DPSS offices, in the parents' presence. The parents would not allow the children to be interviewed privately or to be

14

asked about things other than the petition's allegations. G.A. and L.A. were too young to be interviewed. All of the children appeared to be healthy and well cared for, with no visible signs of abuse or neglect. The children were being homeschooled, and despite earlier reports, A.A. appeared to be developmentally on track.

When asked whether she and her siblings were ever left alone with no supervision, A.A. replied, "Yes, one time." When asked what happened, A.A. said she did not want to say; and when asked why, A.A. said, " 'My parents don't want me to tell you.' " A.A. declined to answer any other questions. When asked a similar question, D.A. replied that Mother " 'left us and went in the car.' " He awoke and found both of his parents gone. Mother interjected and said the children were not left alone; they were left in Father's care. When asked whether he could recall any other times when he was left without adult supervision, D.A. referred to the April 2019 incident in which Mother left the children in her running van, unattended, while she went into a store. S.A. also recalled the incident at the store.

Mother submitted a letter confirming her completion of a 52-week "Breakthrough Parenting" class, which she began attending in June 2018 and completed in June 2019, as part of her probation in her 2017 criminal case. The letter stated that Mother was "a great student!"; attended each two-hour session of the 52-week class; was "on time"; actively participated in group discussions and coursework; was "eager to learn"; and "deeply regretful regarding her poor parenting decisions." The letter further stated, "If the parent is not able to demonstrate a genuine understanding of his or her current family situation, including changes needed for both short-term and long-term success, we do not certify

15

completion." On October 28, 2019, Mother tested negative for all controlled substances and alcohol.

On October 29, 2019, DPSS reported that the parents "continue to isolate the children, be minimally cooperative with the Department, and make unsafe decisions for the children, negatively affecting both their safety and well-being." DPSS did not believe that the parents had benefited from their prior services. On November 1, 2019, the court set a contested jurisdictional and dispositional hearing, and ordered the parents to allow the social worker to interview the children privately, outside the parents' presence, and to also allow minors' counsel's investigator to privately interview the children and visit the family home.

On November 18 and 26, 2019, Mother did not respond to the social worker's phone calls. Then, on November 27, the social worker made an unannounced visit to the family home. She knocked on the door for several minutes, but there was no answer, even though lights were visibly on in the home and several cars were in the driveway. Mother also did not answer her phone when the social worker called her from outside the home on November 27. But after several minutes, Father came outside, closed the door behind him, and told the social worker that she was not supposed to be at the family home or to contact the family until the next court hearing in January 2020. Father claimed his attorney had advised him that the case would be dismissed at that hearing.

The social worker told Father that DPSS would need to make "monthly contact" with the family, including visits in November and December 2019, and January 2020, "pending the court's decision on the next steps of the case." The social worker gave

Father a copy of the court's November 1, 2019 minute order and advised him that the court had ordered DPSS "to interview all of the children outside of the parents' presence." Father said he needed to discuss the matter with Mother and went back inside the home. Several minutes later, the parents stepped outside and told the social worker that they were not going to allow her to interview the children privately, saying they had previously allowed the children to be interviewed, and no concerns were found. Mother said that the previous social worker had "discussed inappropriate things" with the children. The parents allowed the social worker to interview the children "together" but not separately, and not privately, but in the parents' presence. The parents refused to allow the social worker to enter the home, saying it was a holiday and relatives were visiting.

The parents brought the five children outside and "line[d] them up" near the front door. After the social worker told Mother that the two youngest children did not have to be interviewed and could go back inside because it was "extremely cold and rainy," Mother did not respond, continued to hold L.A. in her arms, and "gestured" to the social worker to interview the children. The parents stayed in the doorway while the social worker interviewed A.A., D.A., and S.A. All of the children again appeared to be "safe, healthy, and well cared for with no visible signs of abuse or neglect." But this time, A.A. denied that she or her siblings had been left alone at home. A.A. said she felt safe at home and denied being fearful of anyone. D.A. and S.A. also said they felt safe at home, denied being fearful of anyone, and denied any physical discipline in the home.

The parents then asked the social worker why DPSS continued to contact the family, given that the children said they felt safe at home. The social worker explained that DPSS was concerned about the April 2019 incident in which Mother left the children in her running van, unattended, and that DPSS believed it would be in the family's best interest to have DPSS and the court assist the family with services to ensure that such an incident did not happen again. Mother then said that she "chose" to leave the children in her van "because it was unsafe in the parking lot, as people can speed and there could be 'drug users' and people smoking in the parking lot." Mother explained that it could be difficult to ensure that five children stayed together and were safe in the parking lot, and asked the social worker whether she, the social worker, would have done "anything differently in the situation." The social worker told Mother that a parenting class could help Mother "learn appropriate decision making and how to ensure her children were safe when walking in the parking lot . . . ."

The parents agreed to allow the social worker to visit the family at home again on December 10, 2019, at 6:00 p.m., for the December visit. At that visit, the social worker was allowed into the home; spoke to A.A., D.A., and S.A; and noted no concerns. The social worker then spoke to the parents about the consequences of not "following through on the Court order to allow [the social worker] to interview the children privately." She told the parents to contact their attorneys for legal advice, and she explained that her role was to "document the information obtained during this review period and provide it to the Court." Mother became upset, said she was concerned that the social worker would " 'twist the truth,' " and told the social worker to put Mother's exact words into her

18

report.  Mother said the "initial social worker" had "introduced" the children to pedophilia and she was not going to let that happen again.  Father said the court should know that DPSS staff did not have "superb discernment" because they treated "everyone the same."  Father reiterated that he and Mother did not believe they could benefit from any additional services and would like the case dismissed.

The parents also indicated that they were frustrated because they received a call from a clinical therapist who was supposed to assess the children for mental health concerns.  The social worker explained to the parents that the purpose of the call was to ensure compliance with the state and local "mandate that children receive a mental health assessment in order to ensure their mental health needs, if any, were being properly addressed."  The parents were also told to expect a call from DPSS to schedule a child and family team meeting (CFTM).  The parents said they wanted no further contact with DPSS before the next court hearing.  Father was "irate" when DPSS later called to schedule the CFTM.

At an "add on" hearing on January 22, 2020, county counsel told the court that the parents would not allow DPSS to interview the children privately; it was believed that the parents were "coaching" the children; and DPSS was unsure whether it was "going to get the truth on what's going on in the home from the children."  DPSS wanted to interview the children, privately, separately, and monthly, and also wanted to obtain the name and contact information of the children's homeschool teacher, whom the children saw monthly, in order to review the children's daily homeschool curriculum.  County counsel asked the court to ensure that the social worker could interview the children privately

before the jurisdiction and disposition hearing on February 7, 2020. Minors' counsel joined in these requests and asked the court to "detain all five minors from the parents today." Minors' counsel said she had "serious concerns" because there had been "at least three child endangerment issues related to the family," and the parents were not cooperating either with DPSS or with minors' counsel's investigator. The parents had denied the investigator access to the family home and the children, and they had refused to allow safety and mental health assessments to be conducted for the children.

Minors' counsel also told the court that she had been unable to interview the children since the September 17, 2019 detention hearing, and she remained concerned that the children were being subjected to inappropriate physical discipline and were being left without adequate supervision. Minors' counsel explained that, shortly before the January 22, 2020 hearing, she tried to engage in a conversation with A.A. about her dollhouse, but A.A. repeatedly "plug[ged] her ears" and told minors' counsel that she was not allowed to talk to her. To minors' counsel, it was "evident" that the children had "been extensively coached," that the children would likely not be truthful during interviews, and that the children could not be protected unless detained.

In response, the parents' counsel together assured the court that the parents were cooperating with the investigations, although the parents had concerns about subjecting the children to interviews by strangers; and that the children, all of whom were present in court, were well cared for and were not at any current risk of harm. The court ordered the parents to cooperate with both DPSS's and minors' counsel's investigations, and to abide by the court's orders. This meant that the parents had to allow the children to be

20

interviewed, privately, by DPSS, by minors' counsel, and by minors' counsel's investigator, and that the parents could not discuss the case with the children. The court declined minors' counsel's request to detain the children but told the parents it "may have no choice" to do so, depending on the information it received by the time of the next hearing.

Immediately after the January 22, 2020 hearing, the social worker spoke with A.A. D.A., and SA., individually and privately, in the children's room at the court. The social worker first spoke with S.A. Unprompted, S.A. said, "they don't yell," referring to her parents, and said that "everyone" in the family was "kind to each other with their words." No one would push or hit each other, and in disciplining the children, the parents would either enforce "time outs" or make the children " 'go to sleep early.' " S.A. denied being fearful of anyone or that anyone had told her what to say, and said she felt safe in the home.

The social worker next interviewed A.A., who, upon entering the interview room, reached into her pocket and pressed a button on what appeared to be a phone. When asked what was in her pocket, A.A. said, " 'Not telling!' " and repeatedly refused to show the social worker what was in her pocket. Unprompted, A.A. said that she and her siblings were not spanked in the home. A.A. also said that everyone got along " 'nicely,' " by which she said she meant, " 'nobody is yelling at each other.' " When asked whether there was ever a time when anyone in the home yelled at someone, A.A. said, " 'Not really, well not very often. It's very rare.' " A.A. also said, " 'Not telling,' " when asked whether she could recall the last time anyone in the home yelled at someone,

21

or what happened when either she or her siblings misbehaved. A.A. denied being afraid of anyone in the home.

When the social worker was interviewing D.A., Mother's counsel repeatedly knocked on the door, saying the parents needed to leave for a medical appointment. Still, the social worker proceeded with D.A.'s interview. When asked what he and his siblings were learning while being homeschooled, D.A. said, " 'I don't know, we don't do it very much.' " D.A. also said he did not know when asked whether he was learning to write his name and practicing his numbers or colors. But D.A. was able to identify several colors in the room. D.A. said everyone in the home got along " 'good' " and, if anyone would push, hit, or yell, they " 'went on timeout.' " When asked whether he or his sisters were ever hit or spanked as a form of punishment, D.A. said, " 'Not since the judge said not to.' "

On January 31, 2020, the social worker interviewed the children at the family home pursuant to a prearranged visit. The home was clean with "educational activities throughout the home." Mother allowed the social worker to separately interview A.A., D.A., and S.A. in a bedroom, and denied that there were any recording or listening devices in the room. Mother "shared" that A.A. had a phone in her pocket at the January 22 hearing, and that A.A. kept saying she was " 'not telling' " because she feared she would get in trouble for "playing" on the phone. Mother denied that A.A. was trying to record the interview.

Again, S.A. was the first child to be interviewed. S.A. said things were " 'good' " at home, and when asked whether anyone told her what to say, said, " 'mom and dad

22

did.' " But, when asked what the parents told her to say, S.A. said, " 'I don't know.' "

S.A. denied being afraid of anyone in the home and said she felt safe in the home. Next, D.A. was interviewed. Unprompted, D.A. said he could count his numbers and counted to 39, missing only a few numbers. Also unprompted, D.A. said he knew his alphabet and sang the "ABC song." When asked what schoolwork he had done that day, D.A. said he had practiced writing letters.

When asked what happened after the recent court hearing, D.A. said, " 'We talked about court' "; and, when asked whether anyone told him what to tell the social worker, he said, " 'They said they only want us telling the truth.' " D.A. said he would like to play sports, "but the judge said not to." When asked who told him that, he said, " 'Someone in my family,' " and he would not say who. D.A. again denied being afraid of anyone in the home and said he felt safe in the home.

When it was her turn to be interviewed, A.A., unprompted, told the social worker that she had been practicing her reading and volunteered to read a bible story from one of the books in the room. A.A. said she " 'got prizes' " from her teacher for her reading. When asked what happened after the court hearing, A.A. said, " 'The lady at Court wasn't nice and I didn't like her questions' "—apparently referring to minors' counsel, who interviewed the children in the courthouse after the hearing while the social worker was interviewing the other children. A.A. said, " 'Everyone at Court is against us and wants to take us from our parents, but I'm really happy at home." A.A. said she felt safe at home and denied being afraid of anyone.

23

On January 23, 2020, the social worker contacted the children's homeschool "monitor/teacher," who said the school did not have a structured curriculum and that Mother had created "her own" curriculum for the children. Grading was also optional, and Mother had elected not to have the children graded. The teacher was supposed to meet with Mother and the children monthly, but Mother had not made either herself or the children available for a meeting during the school year. Instead, Mother would send the teacher "sample worksheets and activities" that the children had completed during the previous month. The teacher denied that the children were receiving an inadequate education, although she said she would like them to be working on "higher-grade level activities" because they were " 'a little behind.' "

The teacher met with Mother and the children in the family home on January 27, 2020. On February 3, 2020, the teacher reported on the meeting to the social worker. According to the teacher, A.A. was reading at the second grade level, but she was unable to write three or four sentences at a time and her penmanship needed improvement. She was not, however, " 'grossly delayed.' " D.A. was at grade level for a " 'typical male kindergartener' " and knew the letters of the alphabet and their sounds. S.A. was not of school age but knew the alphabet.

Mother's style of homeschooling is called "unschooling," which is "more flexible" in its curriculum and allows the teaching to be based on the children's interests. The teacher also "shared" that Mother appeared to be more open to meeting in person than she had been during previous months, and that the parents appeared to be " 'skeptical and

cautious of new people.' " The teacher had no concerns about the parents' "overall ability to parent and educate the children."

On January 22, 2020, sheriff's deputies went to the family home to conduct another welfare check, but the parents would not allow them to enter the home or see the children. On February 4, 2020, DPSS reported it was still concerned that Mother would "continue to demonstrate bad decision making" by leaving the children unsupervised, "resulting in one or more of the children becoming seriously harmed or injured." DPSS was also concerned about the parents' "attempts to isolate" the family and their "inability to develop a safe support system for the family, resulting in the children not having supervision in the event" the parents were unavailable. Although two family members came to court on January 22, 2020, to support the family, the parents had never identified any family members or others as their support system.

DPSS acknowledged that the parents were "now cooperative" but believed the parents were coaching the children about what to say to the social worker, given that the children had made unprompted statements, ostensibly intending to give the impression that there were no safety, disciplinary, or educational concerns in the family home. DPSS opined that the parents could benefit from parenting education "in order to assist in teaching the parents better decision making skills relating to the children's safety, and individual counseling for all family members to address the issues of isolation and the family's struggles to reconcile their beliefs with what is appropriate and safe for the children."

25

A report signed and prepared by the investigator for minors' counsel was filed on February 6, 2020. On January 25, 2020, the investigator interviewed A.A., D.A., and S.A. in a bedroom at the family home. The grandmother and great-aunt were present; both were "approachable and cooperative" and said that the parents had asked them to be there "for moral support." The investigator asked to speak with the children outside, but Mother wanted the investigator to interview the children in the bedroom. After the interviews, the investigator suspected that Mother had been listening to the interviews through "some type of baby monitor" because, as the investigator was leaving the home through the living room, she could hear the children "talking through some kind of speaker."

The investigator interviewed A.A. and D.A. together. When asked about "school, chores, and daily activities," A.A. said they usually woke each day around noon, then she changed her answer and said they woke around 7:00 p.m., then she said they woke "maybe" around 7:00 a.m., then she said she was not sure. A.A. volunteered: "I don't know who had the nerve to say we don't play sports because that is ridiculous." A.A. also said she was frustrated by being asked the same questions again and again. A.A. indicated that she was responsible for "taking care of the babies, sweeping the floors, laundry, and a lot of different things." Regarding school, D.A. said they learned music and he likes to play the violin. AA. said they read the bible, grabbed a children's version of a bible, and began to read it out loud. "Many times," A.A. interrupted D.A. when he was talking by "loudly" reading from the bible, making it "nearly impossible" for the

26

investigator to hear or understand D.A.  A.A. ignored the investigator's requests to let D.A. talk.

A.A. told the investigator that she sometimes heard her parents arguing and telling each other to "shut up," but she said they stopped arguing after they " 'get right with the Lord.' "  The parents had argued as recently as two weeks earlier.  Father then brought S.A. into the room, who began to talk about how, a couple of months earlier, Mother lit "a bunch of candles" in the house  because they did not have the money to pay for the lights.  As S.A. was talking, A.A. began reading loudly again.  A.A. would not answer when she was asked whether D.A. had ever been struck with the large ring Father wore. The investigator ended the interviews after A.A. had lain down and said she was going to sleep.

During the interviews, Mother came into the room two or three times and asked the investigator whether she needed anything.  One of these interruptions occurred just as the investigator ended the interviews and began taking pictures of the bedroom.  Mother also asked the investigator, more than once, whether the investigator had recorded the interviews.  Mother asked, "You recorded this for your records, . . .  right?"  The home was clean and organized but "very dark, as all the window treatments were closed." Mother said she covered the windows with cardboard because it was cold and drafty.

D.  *Jurisdiction and Disposition in the Current Proceedings (Feb. 7, 2020)*

On February 7, 2020, DPSS filed an amended petition for the children, and the court sustained its three allegations:  (1) "The mother neglected the health and safety of the children, in that on or about April 17, 2019, the mother left the children unattended in

27

a running vehicle for a period of 30 minutes. Subsequently, the mother was cited for misdemeanor child endangerment" (the b-1 finding); (2) "The mother and father have a history with [DPSS] for allegations of domestic violence and substance abuse as to [A.A. and D.A.]. The parents were both provided with Family Maintenance Services, with which the mother complied. Subsequently, the dependency was terminated and the children remained in the care of the parents" (the b-2 finding); and (3) "The mother has a criminal history, including, but not limited to arrests and/or convictions for disturbing the peace, child endangerment, and driving under the influence. Further the mother is currently on probation" (the b-3 finding).[2]

Mother submitted a letter addressing the allegations of the amended petition and DPSS's reports. Among other things, Mother noted in her letter that 10 months had passed since the April 17, 2019 incident in which Mother left the children in her running van, unattended; the children were unharmed; and during the ensuing 10-month period, the children were not found to be neglected, abused, or unsafe. The letter also noted that, in June 2019, Mother received "a glowing letter" confirming her completion of her 52-week parenting class; the children were "on track with their learning and development"; and their homeschool teacher saw "no need for intervention."

The parents' counsel together argued there was no need to declare the children dependents because the children were not at any current risk of harm. The parents'

---

[2] The amended petition did not include the b-4 allegation, concerning Father's criminal history, which was alleged in the original petition, filed on September 16, 2019: "The father has a criminal history, including, but not limited to arrests and/or convictions for felony robbery."

counsel emphasized that the April 17, 2019 incident occurred nearly 10 months earlier; the parents had cooperated with the investigations; and there was no indication that the children were at any current risk of harm. Mother was still contesting her criminal case, based on the April 17, 2019 incident, and if found guilty, she would have to complete another 52-week parenting class. The parents' counsel also disputed that the parents were isolating the children, had no support system, or were not adequately parenting and homeschooling the children.

Minors' counsel argued that the children were currently at risk of harm because, although Mother completed a 52-week parenting class in June 2019 and completed "Safe Care" in the 2015 dependency case, Mother had failed to benefit from those services because, "We are here yet again for very similar circumstances." Despite her earlier request to detain the children, Minors' counsel agreed that family maintenance services were appropriate but expressed concern that the parents were still isolating the children, had coached the children about what to say, and had listened to the children's interviews. County counsel noted that it took DPSS from April 2019 to September 2019 to "lay eyes on these children," due to the parents' failure to cooperate with the investigations and their refusal to engage in voluntary family maintenance services.

The court pointed out that the parents' initial failure to cooperate, and the amount of time it took to assess the children made "a huge difference with regard to the totality of anything going on with this case." The court acknowledged that the parents had more recently cooperated in allowing the children to be assessed but that those assessments were made "on the parents' terms." Given the parents' initial failure to cooperate with

29

the investigations, the court questioned whether the parents "fully" understood the seriousness of the case. The court said, "I don't feel that there is no risk of harm potentially to these children, or that they're safe at this juncture. I think we're certainly getting to that point. I think it was a huge step since the last hearing [on January 22, 2020] when everyone was here, and there was a lot of concerns provided to the Court and discussed with everyone." The court commended Mother for completing the 52-week parenting class, which the court described as "a great task," but noted that, "in the midst of this, the [April 17, 2019] incident occurred that brought the family to court. Although I know the therapist indicated [M]other benefited, there is still concern whether there was actually benefit if there was a situation where five small kids are left in an unattended vehicle."

The court admonished the parents that, "the more receptive and cooperative" they were "to the process of what needs to happen, this case could be closed out well before six months . . . . [O]nce it can be determined that the children are being cared for properly, [are] safe, and there's no risk. But everything points to the fact that's not the case at this juncture." The court declared the children dependents and adopted DPSS's family maintenance plan, which included parenting education for Mother and individual counseling the parents. Mother appeals the February 7, 2020 dispositional orders. Father did not appeal.

30

### III.  DISCUSSION

A. *Substantial Evidence Supports the Court's B-1, B-2, and B-3 Jurisdictional Findings*

Mother claims that insufficient evidence supports each of the court's jurisdictional findings, namely, the b-1, b-2, and b-3 findings.  We disagree.[3]

#### 1.  Applicable Legal Principles

"We review the juvenile court's jurisdictional findings for sufficiency of the evidence.  [Citations.]  We review the [entire] record to determine whether there is any substantial evidence to support the juvenile court's conclusions, and we resolve all conflicts and make all reasonable inferences from the evidence to uphold the court's orders, if possible.  [Citation.]  'However, substantial evidence is not synonymous with *any* evidence.  [Citations.]  A decision supported by a mere scintilla of evidence need not be affirmed on appeal.  [Citation.]  Furthermore, "[w]hile substantial evidence may consist of inferences, such inferences must be 'a product of logic and reason' and 'must rest on the evidence' [citation]; *inferences that are the result of mere speculation or conjecture cannot support a finding* [citations]."  [Citation.]  "The ultimate test is whether it is reasonable for a trier of fact to make the ruling in question in light of the

---

[3]  Although we generally will affirm a juvenile court's assumption of jurisdiction if *only one* of its jurisdictional findings is supported by substantial evidence, and we need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 451), in this case we exercise our discretion to consider Mother's challenges to each jurisdictional finding, given that any one of them could potentially impact future dependency proceedings involving Mother.  (See *In re Drake M.*, *supra*, 211 Cal.App.4th at pp. 762-763.)

whole record." [Citation.]' [Citation.]" (*In re David M.* (2005) 134 Cal.App.4th 822, 828.)

"At the jurisdictional hearing, the court shall first consider only the question whether the minor is a person described by section 300. Any legally admissible evidence that is relevant to the circumstances or acts that are alleged to bring the minor within the jurisdiction of the juvenile court is admissible and may be received in evidence. (§ 355, subd. (a).) Here, all of the jurisdictional findings were made under subdivision (b)(1) of section 300. A child who is described in subdivision (b)(1) may be adjudged a dependent of the court. (§ 300.) Subdivision (b)(1) applies if, "[t]he child has suffered, *or there is a substantial risk that the child will suffer*, serious physical harm or illness, as a result of the failure or inability of his or her parent . . . to adequately supervise or protect the child . . . ." (§ 300, subd. (b)(1), italics added.)

" 'While evidence of past conduct may be probative of current conditions, the question under section 300 is whether circumstances *at the time of the hearing* subject the [child] to the defined risk of harm.' " (*In re Savanna M.* (2005) 131 Cal.App.4th 1387, 1394 (*Savanna M.*), quoting *In re Rocco M.* (1991) 1 Cal.app.4th 814, 824.) "Thus, *previous acts of neglect, standing alone, do not establish a substantial risk of harm; there must be some reason beyond mere speculation to believe they will reoccur*." (*Savanna M.*, at p. 1394, quoting *In re Ricardo L.* (2003) 109 Cal.App.4th 552, 565.)

2. The B-1 Finding

The b-1 finding states: "The mother neglected the health and safety of the children, in that on or about April 17, 2019, the mother left the children unattended in a

running vehicle for a period of 30 minutes. Subsequently, the mother was cited for misdemeanor child endangerment." Ample substantial evidence supports this finding. The record shows that, on April 17, Mother left the five young children in her running vehicle, unattended, for around 30 minutes while she went into a store. Mother was cited for misdemeanor child endangerment at the time of the April 17 incident. The record also shows that Mother deliberately left her oldest child, A.A., then age six, in charge of supervising her four younger siblings, including two-month-old L.A., in the running vehicle while Mother went into the store.

Additionally, substantial evidence shows that, at the time of the February 7, 2020 jurisdiction and disposition hearing, the children were at a substantial risk of serious harm due to Mother's *continued* failure to realize the substantial risk of serious harm that her April 17, 2019 actions posed to the children. Contrary to Mother's understanding, the b-1 finding is not based solely Mother's act of leaving the children in her vehicle, unattended, on April 17, 2019. It is additionally based on Mother's failure to realize, at the time of the February 7, 2020 hearing, the risk of serious harm that her act of leaving the children in the car posed to the children.

When the social worker went to the family home on November 27, 2019, Mother asked whether the social worker would have done "anything differently" on April 17, 2019, given that it could be dangerous in the parking lot and difficult to keep five children together. The social worker explained to Mother that a parenting class could help her "learn appropriate decision making and how to ensure her children were

33

safe when walking in the parking lot." But Mother remained resistant to any DPSS involvement or services, from April 17, 2019 through the February 7, 2020 hearing.

To be sure, Mother completed a 52-week parenting class in June 2019 and had a "glowing" letter of completion for the class. The letter stated, among other things, that Mother was "a great student" and was "deeply regretful regarding her poor parenting decisions." Although Mother may have regretted her other poor parenting decisions— including driving under the influence on January 31, 2015, with A.A and D.A. in her car—Mother's November 27, 2019 comments to the social worker show that Mother *did not* regret leaving her five children in her vehicle on April 17, 2019. To the contrary, astonishingly, Mother indicated that she did the right thing in leaving the children in the vehicle, unattended, even though the children were "revving the engine," and could have caused the vehicle to move and crash into other vehicles, objects, or pedestrians, injuring the children and other persons.

Mother argues "[i]t appears" that "this case is really about" the parents' "perceived uncooperativeness" and the fact that the April 17, 2019 incident was Mother's *third* child endangerment-related encounter with police since January 2015. We disagree. The court's statements at the February 7, 2020 hearing show that the court did not base any of the jurisdictional findings on the parents' initial failure to cooperate with the investigations. Nor were any of the jurisdictional findings based on the parents' alleged attempts to "isolate" the children, or the parents' alleged failure to have an adequate "support system" for the children. Rather, the court plainly indicated that the parents' initial failure to cooperate had delayed DPSS, minors' counsel, and the court in

34

ascertaining whether the children would be safe in the parents' care *without* DPSS or court intervention. As the court noted, the parents' initial failure to cooperate showed that they did not "fully" understand the seriousness of the case or the risk that Mother's April 17, 2019 actions posed to the children's safety.

And, indeed, the April 17, 2019 incident was the *third* time since January 2015, that Mother placed her children at a substantial risk of serious harm. (§ 300, subd. (b)(1).) Despite Mother's completion of the 52-week parenting class, and her completion of other services in the 2015 dependency case, including the "Safe Care" program, substantial evidence supports the court's conclusion that, at the time of the February 7, 2020 hearing, Mother still did not realize the seriousness of the risk that her April 17, 2019 actions posed to the children, and that Mother's continuing lack of insight placed the children at a continuing risk of serious harm.

### 3. The B-2 Finding

The b-2 finding states: "The mother and father have a history with [DPSS] for allegations of domestic violence and substance abuse as to [A.A. and D.A.]. The parents were both provided with Family Maintenance Services, with which the mother complied. Subsequently, the dependency was terminated and the children remained in the care of

the parents." Substantial evidence supports the b-2 finding.[4]

In the 2015 dependency proceedings for A.A. and D.A., DPSS alleged that Father had a history of perpetuating acts of domestic violence against Mother and that Father had a "self-disclosed prior arrest in 2013" for domestic violence (the prior b-4 allegation). Although the prior b-4 allegation was stricken at the March 27, 2015 jurisdictional hearing in the 2015 case, substantial evidence shows that, at the time of the February 7, 2020 hearing in this case, the parents had a history with DPSS, in the 2015 case, involving *allegations* of domestic violence between the parents.[5]

---

[4] Here, we briefly address DPSS's claim that Mother lacks standing to challenge any "jurisdictional findings relating to [F]ather's conduct." We note that the b-2 finding is the only current jurisdictional finding that "relates" to Father's conduct. But the b-2 finding relates to *both parents'* conduct in the 2015 case. We observe that a reviewing court can and generally will exercise its discretion to determine the merits of an evidentiary challenge to a jurisdictional finding, if the finding (1) serves as the basis for dispositional orders that are also challenged on appeal, (2) could be prejudicial to the appellant or could potentially impact the current or future dependency proceedings, or (3) could have consequences for the appellant, beyond juvenile court jurisdiction. (*In re Drake M., supra,* 211 Cal.App.4th at pp. 762-763.) At the very least, the b-2 finding could both prejudice Mother and impact future dependency proceedings involving Mother, because if it stands it will mean that Mother is an "offending parent." (*Drake M.*, p. 763.) Thus, we exercise our discretion to consider Mother's claim that insufficient evidence supports the b-2 finding.

[5] We reject Mother's claim that collateral estoppel bars "relitgation of the domestic violence allegation" in the current b-2 allegation. It is sufficient to note that collateral estoppel does not apply because the prior b-2 allegation was not actually litigated nor necessarily decided in the 2015 case; rather, it was dismissed. (See *DKN Holdings LLC v. Faerber* (2015) 61 Cal.4th 813, 823-825 [collateral estoppel, or the issue preclusion aspect of res judicata, only applies to issues "actually litigated and necessarily decided" in a prior case]; cf. *In re Joshua J.* (1995) 39 Cal.App.4th 984, 993 [collateral estoppel barred relitigation of previously adjudicated issue].)

Additionally, Mother's substance abuse—particularly her alcohol abuse—was a central concern in the 2015 case. The court in the 2015 case sustained allegations that, on January 31, 2015, Mother was arrested for DUI and child endangerment; her blood-alcohol content was 0.21; the children were with her in her car when she was driving under the influence (the prior b-1 finding); and Mother "minimizes" her alcohol consumption and its effects on her ability to adequately parent the children (the prior b-2 finding). In the 2015 case, Mother admitted "poor choices such as drinking alcohol while pregnant and driving with her two young children while under the influence." The record also shows that the parents were provided with family maintenance services in the 2015 case, and that Mother completed most of her case plan, including individual counseling, parenting education, an online substance abuse program, and substance abuse testing. And, on September 25, 2015, the court terminated its jurisdiction in the 2015 case.

The record also supports a reasonable inference that Mother failed to benefit from her services in the 2015 case, and from the 52-week parenting class she completed in June 2019, and that her failure to benefit from services showed that the children were still at risk at the time of the February 7, 2020 hearing. (§ 300, subd. (b)(1).) Indeed, even though Mother had completed most of 52-week parenting class by April 2019, on April 17, 2019, she left her five young children in her running vehicle, unattended, and claimed, as late as November 27, 2019, that she had done the right thing by leaving the children in the car. This supported a reasonable inference that the children were still at risk of serious harm on February 7, 2020.

37

3. The B-3 Finding

Substantial evidence also supports the b-3 finding, which states: "The mother has a criminal history, including, but not limited to arrests and/or convictions for disturbing the peace, child endangerment, and driving under the influence. Further, the mother is currently on probation." The record shows that Mother was convicted of DUI based on the January 31, 2015 incident, and was convicted of disturbing the peace based on the August 10, 2017 incident. At the time of the April 17, 2019 incident, Mother was still on probation for the April 2017 incident. And, as a minor, Mother served 18 months in the California Youth Authority for armed robbery. The record supports a reasonable inference that Mother's criminal history—particularly her criminal history involving the children—placed the children at a continuing risk of harm at the time of the February 7, 2020 hearing.

B. *The Court Did Not Abuse Its Discretion in Ordering Mother To Complete Further Parenting Education* and *Individual Counseling*

Mother claims the juvenile court abused its discretion in ordering her to complete additional parenting education and individual counseling, as part of the family maintenance plan that the court approved on February 7, 2020. A juvenile court has broad discretion to fashion a dispositional order that will best serve and protect a dependent child's interests. (*In re Jose M.* (1988) 206 Cal.App.3d 1098, 1103-1104.) We will not disturb the court's determination in this regard absent a clear abuse of discretion. (*Id*. at p. 1104.) Here, we find no abuse of discretion.

Mother points out that any order directed to the parent of a dependent child that concerns the care, supervision, custody, conduct, maintenance, and support of the child, "shall be designed to eliminate those conditions that led to the court's finding that the child is a person described in section 300." (§ 362, subds. (a), (d).) Mother argues that the dispositional order directing her to complete additional parenting education and individual counseling "have no relevance to the conditions that led to the [children's] dependency, and even if they did, there [was] no reasonable basis to conclude that another parenting class and individual counseling would be effective in eliminating the conditions that led to" the children's dependency." We disagree.

As we have discussed, the juvenile court found and the record shows that Mother did not benefit from her previous parenting education and individual counseling services. Despite Mother's substantial completion of her services in the 2015 case, and despite her near completion of her 52-week parenting course by April 2019, on April 17, 2019, Mother placed the children at risk—for the *third* time in less than five years—by leaving them in her running vehicle, unattended, while she went into a store. DPSS opined that Mother could benefit from additional parenting education, in order to learn "better decision making skills relating to the children's safety" and that Mother could also benefit from further individual counseling "to address the issues of isolation and the family's struggles to reconcile their beliefs with what is appropriate and safe for the children." Given Mother's failure to benefit from her previous services, the court did not abuse its discretion in ordering Mother to complete additional parenting education and individual counseling.

## III.  DISPOSITION

The February 7, 2020 jurisdictional findings and dispositional orders are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

FIELDS _____
                                                                                    J.

We concur:


MILLER _____
            Acting P. J.


SLOUGH _____
                    J.